**UNITED STATES of America,**
**Plaintiff,**

v.

**The SINGER MANUFACTURING COM-**
**PANY, Defendant.**

United States District Court
S. D. New York.

May 11, 1962.

Lee Loevinger, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for plain-

tiff (Lewis Bernstein, Washington, D. C., John J. Galgay, Richard B. O'Donnell, John D. Swartz, William J. Elkins, New York City, Les J. Weinstein, Washington, D. C., Edward F. Corcoran, James J. Farrell, Jr., New York City, of counsel).

Winthrop, Stimson, Putnam & Roberts, New York City, for defendant (Arthur E. Pettit, Allen T. Klots, Edwin J. Wesely, Terence H. Benbow, Neil F. Twomey, Edward A. Miller, Richard J. Riker, New York City, Chester A. Williams, Jr., New York City of counsel).

RYAN, Chief Judge.

This civil antitrust suit was filed by the United States of America under Section 4 of the Sherman Act, 15 U.S.C.A. § 4 to prevent and restrain alleged violations by the defendant of Sections 1 and 2 of the Act, 15 U.S.C.A. §§ 1, 2. The suit concerns only the United States trade and commerce arising from the importation into the United States of a particular type of household sewing machine known as the "machine-carried multicam zigzag machine." Many of the relevant and material facts were stipulated by the parties prior to trial following extensive informal hearings held with counsel. The very competent senior attorneys and the junior associates appearing both for the Government and for the defendant gave evidence of their great ability, conscientious application and industry, and zealous advocacy. They were most cooperative and helpful; for this, they have the thanks of the Court.

## I. THE ISSUES PRESENTED.

The complaint alleges that, beginning in at least 1956 and continuing up to December 22, 1959, the date of the filing of the complaint, the defendant and the alleged co-conspirators had been engaged in an unlawful combination and conspiracy to restrain and monopolize; and that the defendant had unlawfully attempted to monopolize interstate and foreign trade and commerce in the importation, sale and distribution of household automatic zigzag sewing machines.

The acts alleged to have been committed by the defendant pursuant to the alleged conspiracy and attempt are: (1) the acquisition by the defendant from the alleged co-conspirator Gegauf of two United States patent applications covering automatic zigzag sewing machines; (2) the making of separate agreements with the alleged co-conspirators Gegauf and Vigorelli to insure the granting, with respect to specified patents, of the broadest possible patent claims to each other for the purpose of excluding foreign automatic zigzag sewing machines; (3) the filing of infringement suits and proceedings before the Tariff Commission by the defendant asserting the patent rights assigned to it by Gegauf in conjunction with its own patent rights to exclude the importation into the United States of automatic zigzag sewing machines of foreign manufacture; (4) the action by defendant, in conjunction with the alleged co-conspirators, determining what European manufacturers would be permitted to export foreign made automatic zigzag sewing machines to the United States; and (5) the making by the defendant of a non-aggression cross-licensing agreement with Messerschmitt and the subsequent acquisition by the defendant of the United States Messerschmitt patent application which was the subject of the cross-license agreement, for the purpose of excluding foreign made automatic zigzag sewing machines.

The Government does not charge that the acquisition by Singer of three other United States patents—the Harris reissue, Johnson, and Perla, which are later discussed—was unlawful. On the contrary, it concedes that they were lawfully acquired. It is the acquisition of these two Gegauf United States patents, known as Gegauf No. 1 and No. 2, which is claimed by the Government to be unlawful. It is contended that they were acquired by Singer pursuant to the alleged conspiracy and with a purpose to use them in conjunction with the above three lawfully acquired patents to exclude

competition. The Government also contends that the Singer "401" machine was fully protected under a Gegauf license and the Johnson patent.

From these acts, it is alleged, have flowed the following results: (1) United States importers, distributors and retailers, dealing in household automatic zigzag sewing machines of foreign manufacture, have been precluded from importing, distributing and selling these machines in a market free from unlawful restraints; (2) defendant has been able to acquire and maintain a position of domination and control in the manufacture, sale and distribution of household automatic zigzag sewing machines in the United States; and (3) consumers have been deprived of the opportunity of purchasing household automatic zigzag sewing machines in a free and competitive market. To dissipate these effects, the Government prays that the defendant be enjoined from continuing to carry out the alleged conspiracy and attempt to monopolize and from using its patents and patent rights to effectuate the alleged conspiracy.

The main thrust of the defense lies in the contention that all the complained-of activities of Singer were lawful and were done to accomplish a lawful purpose. Defendant maintains that they were initiated and carried out solely to insure Singer's ability to lawfully protect the manufacture and sale of its "401" sewing machine in the United States and of its "319" sewing machine outside the United States.

The specific issues presented are: (1) Was there an unlawful conspiracy among the alleged conspirators to restrain or exclude competition in the trade and commerce involved?; (2) Did Singer attempt to monopolize this trade and commerce?; and (3) Were the agreements entered into between the parties or any of their provisions *per se* violations of Sections 1 or 2 of the Sherman Act?

The Government did not call any witnesses on its case in chief; it called four witnesses on rebuttal; it offered in evidence 210 exhibits, documentary and physical, during the trial. Defendant called ten witnesses on its case in chief and two in rebuttal; it offered 202 documentary and physical exhibits. After consideration of all this evidence, we make the following findings of fact.

## II. FINDINGS OF FACT.

### A. Description of defendant and of others.

The sole defendant named is The Singer Manufacturing Company (hereinafter Singer), a New Jersey corporation with its principal place of business in this district. Singer manufactures household sewing machines, including machine-carried multi cam zigzag sewing machines, which are particularly involved in this suit. It sells these machines in the United States through a wholly-owned subsidiary, the Singer Sewing Machine Company, and in various foreign countries through independent distributors.

The alleged co-conspirators named in the complaint are:

Fritz Gegauf, A. G., Bernina Nahmaschinen Fabrik (hereinafter Gegauf), a Swiss corporation with its principal place of business in Steckborn, Switzerland. Gegauf manufactures household sewing machines in Switzerland, including automatic zigzag sewing machines, and exports some of these machines to various countries including the United States.

Arnaldo Vigorelli, S. p. A. (hereinafter Vigorelli) is an Italian corporation, with its principal place of business in Pavia, Italy. Vigorelli manufactures household sewing machines in Italy, including automatic zigzag sewing machines, and exports some of these machines to various countries, including the United States.

Although not named as an alleged co-conspirator, there was some evidence presented concerning Messerschmitt, A. G. with whom Singer at times had patent negotiations and dealings. Messerschmitt is a German corporation, engaged in the manufacture and sale of house-

hold sewing machines, including zigzag sewing machines.

## B. A brief description of household zigzag sewing machines and their operation.

Some sewing machines are designed and sold for use principally by housewives for personal and family sewing needs; other machines are produced to meet the requirements of industrial and commercial use. The straight stitch type of household sewing machine comprises three basic devices, namely, a thread-carrying needle which reciprocates in a vertical direction but does not move transverse to the direction of the work feed; a looptaker which, cooperating with the needle, forms a straight line of stitches; and a mechanism which feeds the work to be stitched between such needle and looptaker. These three devices are driven in synchronism by an electric motor or by an operator using a treadle, handcrank, or similar mechanism. The speed of the machine, the length of the stitches and the direction of the feed may be varied by the operator.

The zigzag stitch machine has all of the features and functions of a straight stitch machine and may be operated as a straight stitch machine. In addition, the needle may be shifted back and forth laterally of the normal direction of the work feed, from zero to maximum, within the field of lateral throw of the needle, from a fixed neutral position of non-vibration in the center of such field of throw, so as to produce stitches that follow a zigzag path. The size and shape of the pattern of the zigzag stitch may be altered by varying the amplitude of the lateral needle movements and the amplitude and/or direction of the work-feeding movements. Mechanism may be provided for fixing a neutral position of nonvibration of the needle at either the center or at either side of the field of the lateral throw of the needle and for controlling the lateral throw of the needle within such field, from zero to maximum, either across a center line through such field or from either side of such field. Mechanism

may also be provided, whereby the needle can be laterally vibrated through predetermined patterns of movement modifying the zigzag stitch path, with the result that stitches may be made having various ornamental configurations other than plain zigzag.

There are three general types of household zigzag sewing machines:

1. The manually-operated zigzag machine—a household sewing machine which, in addition to straight stitches, produces continuous plain zigzag stitches and, by manual manipulation, during the operation of the machine, of a handle or lever located on the exterior of the machine, will also produce various ornamental and functional zigzag stitch patterns.

2. The Replaceable Cam ZigZag Machine—a household sewing machine which, in addition to straight stitches, produces without any artistry on the part of the operator, various ornamental and functional zigzag stitch patterns, the preselection of which must be made by the user through the manual removal from the machine of one or more cams and the manual replacement of such cams or cams by one or more substitute cams having cam configurations · different from the replaced cams.

3. The Machine-Carried Multiple Cam Zigzag Machine—a household sewing machine which, in addition to straight stitches, produces without any artistry on the part of the operator, various ornamental and functional zigzag stitch patterns, the preselection of which must be made by the user through a device such as a dial, handle or knob, located on the exterior of the machine, which affects a relative shifting of cam tracking means and a group of machine-carried cams, each having cam configurations different from the other cams.

To properly and efficiently operate any household sewing machine, including a zigzag stitch machine, the machine must first be equipped with needle and bobbin threads. Three adjustments must be made to insure that the machine will sew

with the requisite thread tension, stitch length and work pressure. During the operation of the machine, the operator must synchronize the speed of the machine to the feed of the material sewn to insure that the stitches will be formed in the desired area of the work material.

With each of the three general types of household zigzag sewing machines the operator must in addition make a preselection through a control device determining the width of the zigzag stitch to be produced. With a manually operated machine the zigzag stitch pattern may be varied by the manual manipulation of the stitch width control during machine operation, the results obtained varying with the artistry and skill of the operator. With the replaceable cam and machine-carried multiple cam machines the zigzag stitch pattern is predetermined by the configuration of the particular cam used, which cam in each instance is selected by the operator, by, in the case of the replaceable cam machine, the manual replacement of one cam with another cam and, in the case of the machine-carried multiple cam machine, by the manual use of a dial, handle or knob to select one of a plurality of machine-carried cams.

Multicam, replaceable cam and manually operated zigzag sewing machines are not necessarily of corresponding quality, either as compared with zigzag sewing machines of the same type or as compared with zigzag sewing machines of a different type. A relatively high priced manually operated machine may be of superior quality to a relatively low priced multicam machine, a relatively low priced replaceable cam machine, or a relatively low priced manually operated machine. The price of the machine, regardless of type, in part depends upon the attachments or appurtenances which may or may not be part of such machine, and other factors. Thus, the price may be influenced, as with other commercial products by the reputation of the manufacturer, the availability of service and parts, the available financing arrangements, the instructions as to the use of the sewing machine, type and extent of guarantee, cost of manufacture and distribution, the location and type of shop at which the machine is sold, and the promotion and advertising expenditures.

## C. Description of the patents.

There are five United States patents and one United States patent application which the Government contends are relevant to the wrongful acts charged. Each of these patents and the one patent application is owned by Singer; each discloses a machine carried multicam sewing mechanism. They are as follows:

1. Gegauf Patent No. 2,832,302—application filed May 29, 1953 and patent issued April 29, 1958 (called in this suit Gegauf I).

2. Harris Reissue Patent No. Re. 24,370—original Harris Patent No. 2,-693,778 issued to Carl Harris on November 9, 1954. Harris Reissue Patent application filed June 16, 1955 and reissue patent issued October 8, 1957.

3. Johnson Patent No. 2,862,468—application filed November 29, 1954 and patent issued December 2, 1958.

4. Perla Patent No. 2,810,360—application filed December 8, 1954 and patent issued October 22, 1957.

5. Gegauf Patent No. 2,877,726—divisional application filed December 2, 1957 and patent issued March 17, 1959 (called in this suit Gegauf II).

6. Messerschmitt Application No. 548,481—application filed November 22, 1955.

## 1. Gegauf No. I—Patent No. 2,832,302.

This patent claims the concept, *inter alia,* of a mechanism comprising a series of rotary cams having a common axis and a single retractable cam follower, shiftable relative to each other lengthwise of the common cam axis, in order to select a particular cam, but only one cam at a time, for controlling the lateral needle movement. Such a mechanism can produce only as many different zigzag stitch patterns as it has cams, i. e., one for each cam. The Government stipulated

that the Singer 401 machine is covered by this patent.

## 2. Harris Reissue Patent No. Re. 24,370.

Reissue Claims 1 through 4 allowed in the Harris Reissue Patent were also allowed in the original Harris Patent No. 2,693,778; these claims do not relate to a multicam mechanism. Eight proposed reissue claims were rejected by the Patent Office. This resulted in a series of amendments, substitutions and rejections of claims until, on May 16, 1956, Singer substituted Claim 22, a limited version of the original Application Claims 5, 7 and 8 taken in combination. On August 22, 1956, this substituted Claim 22 was placed in interference with the United States Gegauf patent application Serial No. 358,377, but subsequently it was allowed by the Patent Office as Claim 1 in Gegauf patent (Gegauf I) No. 2,832,302, issued April 29, 1958. All other substituted claims placed in the reissue application were rejected except Claims 23, 24 and 25; these three substituted claims were allowed in Harris Reissue Patent No. Re. 24,370 as Reissue Claims 5, 6 and 7.

Harris reissue allowed Claim 5 includes the limitation, *inter alia*, of a series of rotatable cams having a common axis with each cam being shiftable lengthwise of the common cam axis with respect to the cam follower in order to select a particular cam. Harris reissue allowed Claim 6 includes the limitation, *inter alia*, of a series of rotatable cams having a common axis and a cam follower shiftable relative to each other, lengthwise of the common cam axis, in order to select a particular cam, used in combination with a constantly rotatable cam. Harris reissue allowed Claim 7 includes the limitation, *inter alia*, of a series of rotatable cams having a common axis and a cam follower shiftable relative to each other lengthwise of the common cam axis, in order to select a particular cam used in combination with a particular type of cam follower retracting means.

The parties have stipulated that Harris Reissue Patent No. Re. 24,370 discloses a machine which is covered by Claim 1 of Gegauf Patent No. 2,832,302 (Gegauf I).

## 3. Johnson Patent No. 2,862,468.

This patent claims a concept, *inter alia*, of a mechanism comprising a stack of rotary cams and two cam followers, either of which can track any one cam or in combination can track any two cams simultaneously whereby information from such cam or cams can be utilized to control the lateral movements of the needle. Thus, as the Johnson mechanism has the ability to take information from two cams and combine that information to develop a stitch, it can produce a number of zigzag stitch patterns which far exceeds the number of cams.

## 4. Perla Patent No. 2,810,360.

This patent claims the concept, *inter alia*, of a mechanism comprising a series of rotary cams with each cam being provided with its own cam follower constrained to engage its associated cam only and with each cam follower being provided with its own individual handle so that each follower can be manually thrown in and out of operative engagement with its associated cam. The cam followers may be used singly to track one cam or in combination to track and combine intelligence from any two cams whereby the information from such cam or cams is utilized to control the lateral movement of the needle.

## 5. The Gegauf No. 2—Patent No. 2,877,-726.

The Gegauf No. 2 patent claims the concept, *inter alia*, of a mechanism comprising a series of rotary cams with each cam being provided with its own cam follower constrained to engage its associated cam only, whereby any cam, but only one cam at a time, may be individually selected for controlling the lateral needle movement. Thus, the Gegauf II mechanism can transmit information from any one cam at a time but cannot combine intelligence from two or more cams.

**6. Messerschmitt Application No. 548,-481.**

The Messerschmitt application claimed, *inter alia*, the concepts of (a) a series of rotary cams with each cam being provided with its own cam follower constrained to engage its associated cam only, whereby any such cam may be individually selected for controlling the lateral needle mechanism and with each cam follower provided with its own individual handle, so that each follower can be manually thrown into and out of operative engagement with its associated cam; and (b) a series of rotary cams with each cam being provided with its own follower to control the work feed by a selected cam. The concept set forth in (a) is the same concept claimed in the Singer United States Perla patent.

**D. Introduction of zigzag sewing machines into United States and the development of Singer's 306, 319 and 401 machines.**

Users of industrial sewing machines, both in the United States and abroad, employed zigzag sewing machines prior to 1900. The known art at that time is illustrated by Leilich United States Patent No. 386,252, issued July 17, 1888, which disclosed an ornamental zigzag stitch sewing machine. This machine had two replaceable cams—one imparted lateral zigzag movement to the needle; the other controlled the amplitude of the work-feeding movement; these cams could be replaced by other cams giving the operator a choice of ornamental stitches.

The first Singer zigzag stitch sewing machine manufactured especially for use in the home was the model "206" machine; importation and sale of this machine in the United States commenced in 1951. The "206" machine was manufactured by Singer in its German plant under its Tiesler patent from approximately 1934 to the opening of World War II; later, commencing in 1949, similar machines were manufactured in the Singer factory in Scotland.

The "206" was of the manually operated zigzag type with built-in rotating cam; it did not have the replaceable cam of the earlier Leilich. In the "206", by manual manipulation during the stitching cycle the throw of the cam could be modified and the amplitude of the zigzag stitch varied.

In 1948 shipments of an Italian-made "Necchi" zigzag stitch machine (manually operated) first came to the United States. The sales of these "Necchi" machines commercially demonstrated by 1951 that a definite market in a household type zigzag sewing machine existed in the United States. The "Elna" zigzag machine (replaceable cam) was introduced in the United States in 1952. This machine, as the Leilich machine, had two rotary cams and two cam followers. The two cams of the "Elna" machine were replaceable by other cams so that a number of stitch patterns could be produced.

Ralph E. Johnson, a member of Singer's Experimental Department in the Elizabethport, New Jersey plant, commenced work on the development of a household zigzag machine and completed a design of a new machine on April 29, 1953. This design is embodied in the Singer Class 401 machine. The Class 401 machine (machine-carried multiple cam) incorporates a stack of rotary cams and a pair of cam followers, movable lengthwise of the axis of the cam stack, either of which can track any one cam or in combination can track any two cams, whereby information from such cam or cams can be utilized to control the lateral movements of the needle. The Class 401 machine is disclosed in the Johnson U. S. Patent No. 2,862,468 (supra). The design of the Class 401 machine required the manufacture of a new sewing machine. It took Singer four years to develop and to produce the necessary manufacturing and assembly tools so as to permit manufacture of the machine in an efficient and economical manner. The Class 401 machine was placed on the market in June 1957.

On March 9, 1953 Martin R. Perla and Edward Koenig, members of Singer's

Experimental Department in Bridgeport, Connecticut plant, were directed to design and develop an improved Class 206 machine, which was to incorporate a replaceable cam. The design of this machine was completed by March 25, 1953 and is embodied in the Singer Class 306 machine (replaceable cam). This design eliminated the cam of the Class 206 machine and superimposed on such machine a zigzag mechanism having a rotary removable cam, otherwise leaving the Class 206 machine substantially in its then existing form. Manufacture and sale of this Class 306 machine was started in the United States and abroad in 1954 and a substantial number of said machines were sold in the United States until 1956 when manufacture, but not sale, of it in the United States was stopped and manufacture of a new Class 319 machine was commenced both abroad and in the United States. The Class 306 machine continues to be manufactured and sold abroad.

On April 1, 1954, Martin R. Perla was also directed to design and develop an improved Class 306 machine, which· incorporated a multiple cam arrangement in lieu of the replaceable cam of the Class 306 machine. This design was incorporated in the Singer Class 319 machine. The Class 319 machine (machine-carried multiple cam) incorporates a built in stack of cams, each with its own follower. The cam followers may be used singly or in combination to track one or more selected cams, and to combine intelligence from two or more cams, whereby the information from such cam or cams is utilized to control the lateral movements of the needle. The Class 319 machine is disclosed in the Perla Patent No. 2,810,-360 (supra). The production of this machine was commenced on November 18, 1955 and it was put on sale in 1956, both in the United States and abroad. Manufacture of the Class 319 machine was discontinued in the United States in 1957 when it was superseded by the Class 401 machine. The Class 319 machine continues to be manufactured and sold abroad.

In September 1953, the Italian firm of Vigorelli introduced in the United States a multi-cam zigzag stitch sewing machine. The Vigorelli machine incorporated a unitary stack of removable rotary cams, a single cam follower, movable lengthwise of the axis of the cam stack, for tracking any one of such cams, and means for transmitting the motion of the follower to the needle. This involved two ideas. The first idea comprised the concept of utilizing, in combination, a replaceable cam, a cam follower and a means to transmit the motion of the cam follower to the needle bar for the purpose of controlling the lateral needle vibration, in accordance with the shape of the cam, which motion transmitting means included a manually operable mechanism for adjusting and varying the amplitude of such lateral needle vibrations and for determining the neutral position of non-vibration of the needle. This idea was incorporated in the Singer 306 design. The second comprised the concept of utilizing, in combination, a plurality of cams, cam following means and means to transmit the motion of the cam following means to the needle bar for the purpose of controlling the lateral needle vibration in accordance with the shape of any cam, which motion transmitting means included a manually operable mechanism for engaging the cam following means with any one of the cams. This idea was incorporated in the Singer 319 and 401 designs.

The first Japanese-made multi-cam zigzag stitch machine was introduced in the United States in September 1954 by Brother International Corporation. This machine, as the Singer 401 and the Vigorelli machine, incorporated a plurality of rotary cams and a single cam follower which could be engaged with any one of the cams for laterally vibrating the needle through a predetermined pattern of movement.

In April 1955, Singer first learned that Vigorelli had introduced into the United States a modified form of its multi-cam machine. This modified form differed

from the first machine in that in the modified form the single cam follower was adapted not only to engage any one of the cams but in addition to engage any two adjacently disposed cams, which provided an additional variety of ornamental stitches. This idea of taking information from two cams at the same time was embodied in the Singer "401" and "319" machines.

### E. The sewing machine industry in the United States and Singer's position in it.

Directly after World War II household straight stitch sewing machines were manufactured in the United States by White Sewing Machine Corporation, Free Sewing Machine Company, Inc., The Bell Manufacturing Corporation, Burtman Electric Company, Gelman Manufacturing Company, Inc., and The New Process Gear Company, as well as defendant Singer. By 1959, with the exception of The New Process Gear Company, which manufactures only straight stitch sewing machines on specifications and orders from a single domestic customer, defendant Singer was and now is the sole manufacturer of all household sewing machines made in the United States.

During the period 1948 to 1959, importations of household sewing machines, including zigzag machines, from Japan grew from 3,000 machines to 1,100,000 machines; and importations from Europe from 2,500 to 100,000. The only sale and distribution in the United States of sewing machines, including zigzag machines, other than those of defendant and New Process Gear Company, are of machines imported into the United States.

White Sewing Machine Corporation discontinued its manufacturing operations in the United States in 1957. According to the White annual report published for the year 1957: Both White and Sears Roebuck & Company had been fighting a side by side but losing battle, over the preceding five or six years, in trying to sell White's lines of sewing machines made in the United States in competition with foreign-built imports. When Sears discontinued selling the White machines and started importing machines for distribution by Sears, it was obvious that White had no chance of supporting its sewing machine manufacturing facilities. Confronted with this situation, the White management decided to have its lines of sewing machines produced for it in Japan and Germany, and to dispose of its principal sewing machine manufacturing facilities.

Most of the sewing machines, including zigzag sewing machines, imported from Europe are complete machines, consisting of head (mechanism of machine), motor, wiring, lights, equipment and appurtenances. Those imported from Japan prior to 1959 consisted only of the "head" —that is, the mechanism of the machine. In 1959, Brother and in 1960 Transworld Industries, two of the largest Japanese importers, began importing heads to which there had been added in Japan the motor, lights and wiring. To the head there is added in the United States, by importers or distributors, carrying cases, cabinets, equipment and appurtenances and, where not already so equipped, motor, wiring and lights. Indeed, some of the various items may also be imported into this country. The assembled units are distributed principally through (1) department stores and mail-order houses, which order directly from distributors or factories in Japan or from distributors in the United States, and (2) wholesale distributors who import the machines directly or purchase them from importers and sell them to retail dealers. Some of these wholesale distributors, including Brother and New Home, two of the largest distributors, are subsidiaries of the two largest Japanese manufacturers and the sole distributors for particular Japanese manufacturers.

Most of the retail dealers of imported Japanese and European zigzag machines throughout the United States determine and fix their own list prices for machines handled by them and the actual prices at which they sell such machines, with the result that the same machine may have different list prices and may be sold at

different prices in different shops. The price at which such a machine may be sold is generally determined by bargaining at the dealer's shop, and may be sold at the list price or for an amount off the list price. Dealers' list prices for a particular European-made zigzag sewing machine do not differ as much as dealers' list prices for a particular Japanese-made zigzag sewing machine. Generally, a customer can bargain a greater amount off list price for Japanese-made machines than can be bargained off list price for European-made machines. List price includes those prices that a retailer might quote to a customer for the purpose of presenting some price and the actual selling price may be substantially reduced.

The defendant Singer presently manufactures household straight stitch, replaceable cam and machine-carried multiple-cam zigzag stitch sewing machines in the States of New Jersey and South Carolina. Singer distributes them in the various states of the United States through its wholly-owned subsidiary, Singer Sewing Machine Company, which operates about 1600 retail stores throughout the United States. The principal portion of the Singer sales in the United States are through these retail stores. In addition, leased outlets are operated by Singer Sewing Machine Company in approximately 80 department stores located in various states. It also sells at wholesale to approximately 270 independent retail stores, which market all three types of zigzag machines. Singer also sells household sewing machines, including all three types of zigzag machines, in various foreign countries of the world through its own and independent distributors, who operate thousands of retail stores in such countries. Singer owns and operates plants manufacturing various types of machines in 14 foreign countries.

Singer also offers financing for the purchases of its machines; provides servicing of the machines; and conducts sewing classes in their use. We noted also that Singer cuts its own logs for use in making its cabinets.

In the years 1956, 1957, 1958 and 1959, Singer sold in the United States the number of units of the Singer 306 and 403 replaceable cam zigzag machines and of the Singer 319 and 401 multiple cam machines below set forth:

| | Model No. | 1956 | 1957 | 1958 | 1959 |
|---|---|---|---|---|---|
| Foreign mfg.— | 306 | 48,014 | 19,308 | 9,927 | 13,308 |
| U. S. mfg.— | 403 | not | in | existence | 50,269 |
| | 319 | 56,965 | 31,838 | 4,199 | 1,028 |
| | 401 | | 74,503 | 147,446 | 155,422 |

We have observed (*supra*) that the manufacture by Singer in the United States of the Singer 319 machine was commenced, and of the 306 machine was stopped, in 1956. Of the Class 306 machines above set forth the following number thereof had been manufactured in the Singer Clydebank, Scotland plant (where they continue to be manufactured): 1956, 20,707; 1957, 17,708; 1958, 9,927 (all); 1959, 13,308 (all). All other machines above set forth, except 138 of the Class 319 machines, had been manufactured in the United States. In the years 1958 and 1959 Singer's dollar volume of sales of the 401 machine amounted to $44,233,800 and $46,626,600 respectively, approximately 45% of its total gross dollar sales of all models of household sewing machines in the United States for each year.

Singer's Class 401 multicam zigzag sewing machine, with carrying case, sells

at retail in the United States at $340. Singer's Class 306 and 403 replaceable cam zigzag sewing machines, with carrying cases, sell at retail in the United States at $202 and $280, respectively. Singer's Class 206 manual zigzag sewing machine, with carrying case, sale of which terminated in 1958, sold at retail in the United States in 1958 at $202.

With the Singer machines, there is no bargaining about price in an outright sale. The Singer 401 was introduced to the market in 1957 over 1½ years before the 403; it was supported with a vigorous and expensive advertising campaign: Singer spent in advertising the 401 machine approximately $2,145,000.00 in 1957; $1,270,000.00 in 1958; $1,340,000.00 in 1959; and $1,399,000.00 in 1960. It was vigorously pushed by salesmen, being the top-of-the-line or most expensive sewing machine, and the salesman's commission was computed on the basis of the sale price of the sewing machine. The Singer 403 machine was put on the market in April 1959 and Singer spent in advertising this sewing machine approximately $545,000.00 in 1959 and $120,000.00 in 1960. The Singer 404 machine was put on the market in January 1959 and Singer spent in advertising this sewing machine approximately $585,000.00 in 1959 and $130,000.00 in 1960. Notwithstanding the greater effort and expense in promoting and advertising the Singer 401 and its earlier appearance on the market, the sales of both the 403 and 404 machines have had substantial increases, whereas the sales of the 401 have shown little change. In its advertising, Singer presented its 401, 403 and 404 machines as being a group of three sister sewing machines, all of which would perform substantially the same function.

It is against this background that we turn to examine the various agreements which, according to the Government, evidence the conspiracy to exclude competition in automatic zigzag sewing machines of foreign origin, in particular, of Japanese origin.

## F. The alleged conspiracy to restrain and monopolize trade.

### 1. THE AGREEMENTS CHALLENGED.

#### a. *Singer Vigorelli cross license agreement.*

During the period of the development of the Class 306, 319 and 401 machines, respectively, Singer commenced investigations to determine if Singer were free, from a patent standpoint, to manufacture and market these machines in the various countries of the world. This investigation to insure patent validity and freedom of infringement was continued from time to time during the tooling period of these three machines.

In the course of its investigation, Singer in September 1953 came across the Vigorelli multicam zigzag sewing machine (Model-Zigzag 'A') and sought from its experts an analysis of the machine and advice on the claims it encompassed and employed. Its patent counsel advised Singer that, although it felt as a case of "last resort", it could "cast doubt" on the validity of any claims Vigorelli might obtain, it could not say with certainty that it could overcome them. These claims, as we have seen, encompassed a "rotary pattern cam mechanism" with a removable nest of cams out of which a single cam could be selected and manually controlled, which was basically a modified form of the mechanism employed by Singer in its "306" machine disclosed in Singer's expired United States Tiesler Patent (ideas also incorporated in Singer's "319" and "401"). Vigorelli had not obtained a patent in the United States for its machine. Although Singer felt that the manually controllable means infringed two Singer-owned foreign patents, it was quite sure that the rotary pattern mechanism of Singer's "306" infringed that of the Vigorelli Zigzag A. That mechanism had been completely disclosed in an instruction book put out by Vigorelli as early as August 1953; although Singer had found no Vigorelli patents claiming the rotary cam mechanism, it had little doubt that

Vigorelli had applied for such a patent in Italy and possibly in the United States. While this possibility was considered by Singer as "the usual business risk", Singer was far from certain that it could overcome Vigorelli's claim but thought that it might be in a position to properly question its validity and, if required, to obtain a reasonable agreement. Singer had spent considerable time and money on its machines; the "306" and the "401" were in the process of being developed; nothing could be definitely determined regarding the Vigorelli machine while the patent applications, if any, were not open to inspection. Singer decided to take the risk of marketing its "306" machine while continuing its search for information as to the Vigorelli machine.

In 1954, the first Japanese-made multicam machine was introduced by Brother International Corp. It incorporated the mechanism of the Vigorelli Zigzag A and the "401" machines.

In April 1955, Singer first learned that Vigorelli had introduced a modified form machine which differed from the earlier Zigzag A in that the rotary cam mechanism through a cam follower could now select a pair of cams instead of just one. Singer also learned that the claims of both the Vigorelli Zigzag A and the modified form machines had been revealed in two unexpired Vigorelli Italian-issued patents, No. 497,557 (filed January 28, 1953) covering the first multicam machine and No. 507,862 (filed September 29, 1953) covering the modified multicam machine. However, the modified machine still retained the manually controllable means which infringed Singer's foreign patents.

More important, however, was the fact that Singer was of the opinion that the Vigorelli modified machine also infringed the Singer "401" machine covered by the Singer owned Johnson patent which had been filed on November 29, 1954. Although this filing date was after the filing of the Vigorelli Italian patents, the Singer "401" machine had been developed prior to the filing date of the second Vigorelli Italian patent. It was on this basis that Singer felt its patent application was dominant to that of Vigorelli's. This confidence on Singer's part was not to last long, however, for further examination of the earlier Vigorelli Italian patent led Singer to conclude that, if Vigorelli succeeded in obtaining a patent on the stack of cams with a single follower, it could dominate the basic idea of both the Singer "319" and "401" in foreign countries, and that it was more than likely that someone other than Vigorelli might dominate in the United States. In order to secure as much protection as possible, Singer then purchased the Harris patent No. 2,693,778 filed in the United States on June 9, 1952 and issued to Carl Harris November 9, 1954. Although this did not claim a multicam mechanism and therefore did not dominate any of the Singer zigzag machines, it did disclose, prior to any known use or known patent priority date, a plurality of rotary cams and a single cam follower, for selecting and relating the needle to a particular cam.

Having acquired the Harris patent, Singer could endeavor to secure a claim broad enough to protect its "319" and "401" machines by obtaining a reissue of the Harris patent which would combine the Harris claim (which was disclosed but not claimed in the patent as issued) with those incorporated in the "401", "319", and the Vigorelli and Brother machines; by filing for a reissue, it could precipitate a patent interference proceeding between a Harris reissue application and any other pending application. A possible result of this course might be that the claims involved in the interference would be awarded to the Harris patent by reason of its prior filing date. Another possible result might be that the Patent Office would reject the claims as too broad. It was the view of Singer that such a rejection would serve as a good indication that no one else could be awarded the claims.

It was with this purpose in mind and to protect its "319" and "401" machines that Singer acquired the Harris patent. However, Singer was confronted with

still another problem: whether Singer's broadened claims, if allowed on a reissue application of the original Harris patent, would relate back to the early filing date of June 9, 1952 which would give Singer six months priority over Vigorelli's Italian patent, on the multicam and selector means, the particular mechanism common to the Singer "319" and "401" machines; and whether, in the happening of such event, this earlier priority date would be given under the law of Italy to the Italian Harris patent which had been filed six months after the Vigorelli Italian patent. If the earlier date of June 9, 1952 were accepted in Italy it would give Singer priority in Italy as well as in the United States. On the other hand it was entirely possible that neither eventuality would occur, and that Singer would not have priority anywhere.

But, whatever the result might be, Singer felt that with the Harris patent, it was in a better position to bargain; and even though, Singer was anxious to adjust the matter by agreement with Vigorelli, Singer proceeded with great caution. Singer did not think it wise to reveal to Vigorelli at that time what its purpose or views were.

Litigation developed as anticipated but from an unexpected quarter—Brazil. Here, Vigorelli had filed a patent application, which under Brazilian law Singer felt compelled to oppose lest Vigorelli achieve what might eventuate into a dominant position. Accordingly, Singer filed opposition to the Vigorelli application in Brazil. Such a step, it knew, would be only the beginning for it foresaw, and rightly so, that to stop Vigorelli from obtaining dominant patent rights it would have to oppose in each country in which Vigorelli might choose to file. Right on the heels of the Vigorelli-Brazil opposition, Singer found itself faced with another application in Brazil by Brutsch & Co. on a multicam arrangement. Singer also felt compelled to oppose this Brutsch application; and also a further application by Vigorelli filed in Great Britain.

It was soon quite obvious that the race for a patent on the multicam mechanism promised to become bitterly contested—indeed, a desperate one with the victor unknown. And yet, in spite of the urgency of the situation, Singer adopted a strategy to have its planned encounter with Vigorelli appear "fortuitous" and to proceed with the "greatest caution" in making the first move, especially since it felt that Vigorelli—as a competitor—might not feel either too sure or too confident of its position. Singer decided to test and explore Vigorelli's reaction to some agreement and, if it was friendly, to hold a further meeting. Although it was planned by Singer that its New York patent counsel Stanford would go to Italy expressly for any arrangement that might be worked out, Singer went to great pains not to give the impression that anybody from its organization would make a special trip, preferring to have it appear that someone from Singer, while in Europe on other business, could handle the arrangements with Vigorelli. Stanford was to tell Vigorelli that Singer knew that at least two other companies were planning to acquire patents which might adversely affect it and Vigorelli and that standing together both could more effectively dissipate the effectiveness of such an acquisition. He was to convey the thought that Singer could assist Vigorelli. There followed a discussion between Vigorelli and Singer's Italian representative, Lando, from which it was clear that Vigorelli had a "shrewd idea" of Singer's plan and was "purposely or otherwise" vague about the Brazilian patent—and pretended ignorance of Singer's opposition there.

During the negotiations, Singer for the first time heard from Vigorelli of a Gegauf patent covering a multicam mechanism which, according to Vigorelli, had been deposited by Gegauf in a small number of countries and that Vigorelli was negotiating with respect to it. Singer's endless quest for patents on the multicam mechanism had failed to uncover any such patent but Singer was careful to hide this fact from Vigorelli. Singer

proceeded then to attempt to learn from Vigorelli "unobtrusively and without any degree of emphasis" the basis of the discussions between Gegauf and Vigorelli. The fears aroused in Singer for the future of its "401" and "319" machines by the discovery of the earlier Vigorelli patent were now further sharpened by the discovery of the even earlier patent, which, according to Vigorelli, had also been deposited in the United States. It was imperative that Singer come to some immediate agreement with Vigorelli, for the alternative of pressing the Harris reissue in an attempt to frighten off Vigorelli and others had lost its value, since Singer feared that, if it did push this application, it would be revealing to Vigorelli and Gegauf the weakness of its position. To make matters worse, it was informed by its British patent counsel that its opposition to the British Vigorelli application would have failed. At this point, Vigorelli had also filed a United States application corresponding to its two earlier Italian patents.

Thus concludes the background against which the license agreement was entered into by Singer with Vigorelli on November 17, 1955. It can hardly be seriously contended that the agreement was a preliminary step to effectuate a conspiratorial plan or an attempt to monopolize. In truth, Singer's back was against the wall in this matter and it was only thru swift and clever tactics that it was able to wrest some sort of victory out of what promised to be total defeat or at best a Pyrrhic victory.

It is most significant that throughout its negotiations with Vigorelli and right through the execution of the license agreement, Singer had no independent knowledge or information with respect to the Gegauf I patent. Singer had absolutely no contacts or dealings with Gegauf, whom it did not even know. Had it not been for Vigorelli's volunteering the very scanty information on the Gegauf I patent, Singer would have remained in total ignorance of it for prior to and even after learning of it, Singer had been unable to discover any trace of such a patent even though its search had been continuous and thorough. As late as November 14, 1955, Singer's German patent counsel was still searching for German and Italian applications with no success; it was not until January 1956, after its license with Vigorelli had been finally executed, that it discovered Gegauf's United States application. It was much later that Singer met Gegauf.

The fact that Singer knew that Vigorelli was negotiating with Gegauf about the patent did not charge Singer with knowledge of any possible wrongful purpose of these negotiations, or with the parties' intent (be it good or bad), nor did it impose on Singer a duty to make further inquiry. There is no evidence to support an inference that Gegauf knew of the negotiations between Singer and Vigorelli. At no time during the negotiations with Vigorelli was any mention made of excluding Japanese competition. There is no evidence that Singer was then contemplating, or that it had mentioned, that it planned to purchase any patent from Vigorelli, Gegauf or Messerschmitt.

The license agreement of November 17, 1955, which Singer made with Vigorelli provided (1) that Singer would not bring any infringement action against Vigorelli under the patents issued or about to be issued in any country with respect to the subject matter disclosed in Vigorelli's Italian patents 497,557 and 507,862—when embodied in sewing machines manufactured and sold by Vigorelli; and (2) that Vigorelli would not bring any infringement action against Singer under patents issued or about to be issued in any country with respect to the subject matter disclosed in United States patents No. 2,693,778 and in United States applications by Johnson No. 471,766 and by Perla No. 386,684 when embodied in sewing machines manufactured and sold by Singer; and (3) that neither would institute any opposition, nullity or invalidation against or otherwise attack any of the above noted patents or applications and would withdraw any such proceeding if already instituted; but that in

the event the parties did become involved in any office priority proceedings such as a "United States interference" or a "Canadian conflict proceeding", both would work to settle such proceedings in accordance with the laws and regulations of the patent office concerned.

The agreement was limited expressly to the patents which threatened to involve the parties in litigation over priority—the two Vigorelli Italian patents Nos. 497,557 and 507,862 and only "when embodied in sewing machines manufactured and sold by Vigorelli"; and the United States Singer patent No. 2,693,778, Johnson No. 471,766 and Perla No. 386,684, and again only when "embodied in sewing machines manufactured and sold by Singer".

■■ The proviso not to sue each other for infringement and not to oppose each other's claims on these patents was perfectly consistent, proper and lawful with the exchange of licenses under their respective patents and, if the lack of opposition did result in permitting the issuance of broad claims to each one under his patents—it was not unlawful for it was being done for a lawful purpose. There is no duty, for public benefit or otherwise placed on a patentee or licensee to oppose the claims of another in order to narrow or invalidate the scope of patent which might issue to the other. The provision to withdraw any interference proceedings which might have been instituted prior to the agreement and to settle interferences in accordance with the laws and regulations of the patent office involved "and in the spirit of the agreement" were steps—and lawful ones—necessary to effectuate the mutual promises and to carry out the obligation not to become involved in litigation with each other.

Neither licensee was nor could be sure enough of his ground to risk patent litigation. Each party in licensing the other, surrendered a valuable property right in exchange for permission to use the other's property.

■ We find that there was no agreement to use the legitimate means of a license to stifle competition by helping each other acquire broad patent claims and by agreeing to assert the patents only against certain competitors. We find that there was no agreement or understanding between Singer and Vigorelli that was not there expressly stated. There was no promise or commitment made by either of the parties with respect to licensing or not licensing, enforcing or not enforcing, by infringement action or otherwise, of any patent, then owned or subsequently to be acquired, or with respect to the use in any way of any such patent, alone or in conjunction with any other patent; and no agreement that either would restrict in any way its ownership of any patent.

We find that in approaching and in bargaining with Vigorelli, Singer was at all times dealing at arm's length, solely in its own interest for the purpose and with the intent of reaching a cross-licensing agreement. Singer's purpose in entering into the cross-licensing agreement with Vigorelli was to secure to Singer the ability to sell its "401" and "319" machines in the various foreign countries where sale might otherwise have been foreclosed by enforcement of the Vigorelli patents, or at least to be free from the threat of litigation with respect to these patents.

*b. Singer Gegauf license agreement.*

We have seen that during its negotiations with Vigorelli, Singer for the first time learned about the Gegauf patent and Vigorelli's negotiations with Gegauf. On October 20, 1955, Singer discovered that the Gegauf patent had been deposited in Switzerland on May 31, 1952, and at the same time obtained a copy of its corresponding Italian patent which enjoyed the same date. This patent disclosed (1) an embodiment of a zigzag stitch machine, having a stack of cams and a single cam follower, which by sliding lengthwise of the axis of the cams could engage any one of such cams, and (2) an embodiment

of a zigzag stitch machine having a stack of cams with each cam having its own individual follower. In January 1956, in its continued and extended search, Singer learned that on May 20, 1953, Gegauf had filed a United States application corresponding to the Swiss application and bearing the date May 31, 1952. This was nine days earlier than the priority date of Singer's United States Harris patent No. 2,693,778 which had been filed on June 9, 1952.

At this time Singer also learned that Vigorelli had entered into a license agreement with Gegauf similar to that which it had with Singer.

In January 1956, Singer was advised that its Harris reissue patent was about to issue. Singer feared that an interference might be declared between this patent and the United States application of Gegauf. Singer was therefore most anxious to negotiate an agreement with Gegauf similar to the one it had with Vigorelli. Armed with the knowledge that the Gegauf patent had priority of nine days (which it assumed Gegauf did not know), Singer felt that it was in a better bargaining position and thus Singer was anxious to conclude an agreement before the interference disclosed to Gegauf its superior position.

Singer did not inform Vigorelli of its plan however but did suggest to its Italian representative that, without arousing Vigorelli's curiosity, he find out the details of the Vigorelli-Gegauf agreement and the names of the Gegauf officials with whom Vigorelli negotiated or their patent attorneys as well as the location of their offices. Singer was particularly anxious to know what Vigorelli had found out with respect to Gegauf's patents which had induced Gegauf to drop its original demand of $160,000 and grant Vigorelli a license for nothing.

It is clear that Singer intended to negotiate with Gegauf separately and as secretly as possible. Although it made use of Vigorelli, it did so as a matter of necessity and solely to gain bargaining information. Vigorelli, on its part, apparently was just as secretive about its affairs.

Singer's representative, Dr. Lando, met with Vigorelli on February 29, 1956. As a result of this meeting, Lando was able to report that Vigorelli had stated that it had obtained a free license from Gegauf because of the comparative weakness of Gegauf's Italian patent, and because of the fact that Gegauf had deposited its patent in only four countries as opposed to filings in seventeen countries by Vigorelli, and because of Vigorelli's awareness of certain patents which Gegauf considered dangerous to its patent. Lando also reported that Vigorelli's curiosity as to Singer's motive had been aroused, but he added that Vigorelli thought Singer was collecting information to oppose the Gegauf patent in the United States in order to prevent the sale of its machine there. Lando further reported that his (Lando's) expression of doubt as to this disappointed Vigorelli since Vigorelli was apparently hoping that Singer was about to get active against Gegauf in patent contests in the United States, all to its (Vigorelli's) benefit.

Gegauf and Vigorelli were not exchanging confidences nor were they seeking to promote each other's interests. The treatment accorded Gegauf by Singer was to be no more candid—Singer's objective being to keep Gegauf in the dark as long as possible and to disclose only what was absolutely necessary to the effectuation of Singer's plans. Singer had decided to approach Gegauf in substantially the same manner it had approached Vigorelli, that is, with intimations of litigation.

The Singer Swiss Manager informed Gegauf that Singer was desirous of discussing "patent questions". On April 13, 1956, a momentous meeting was held at the Gegauf factory in Steckborn, Switzerland. When entering negotiations at this conference, Singer knew that Gegauf had a patent issued in Switzerland with a priority date nine days before that of the Harris patent and that the principal claim of this patent read directly on the Singer "401" machine. Singer also knew

that Gegauf had filed a United States application, claims of which Singer presumed would read on the "319" and "401" machines. Singer was also advised of the fact that Gegauf had an application pending in Germany, which might mature into a patent which would read upon the "319" and "401" machines, and that Gegauf also had an Italian patent the validity of which might be put in question due to the manner in which it was written. Singer also had information that Gegauf was reported to have serious worries as to whether certain prior patents, if called to the attention of Patent Offices, would limit or invalidate its claim. Singer realized too that the Harris reissue application in the United States read on the Gegauf machine and that the various Harris patent applications on file in foreign countries, had claims which if they could be properly amended would read on the Gegauf machine.

Waterman of the Singer United States office reported on this 7½ hour meeting to New York as one which was not as straightforward as that with Vigorelli, due to a feeling on the part of Gegauf that its situation was superior and that it was "suspicious of our intentions"; that Singer did nothing to dispel Gegauf's fear that it was going to be hurt in the United States by the lower priced Japanese machines, because "one of the strong points" which was to be used in favor of the agreement was protection against the Japanese. Waterman also reported that Gegauf had thrown out a lot of topics having nothing to do with patents, among them a suggestion that there be a division of territories between Gegauf and Singer which "was brushed aside pronto in short order". Waterman also felt that Gegauf was very much afraid that Singer wanted to copy its machine and wanted a promise to the effect that it would not do so; and he left Gegauf with no doubt that Singer was going to oppose the issuance of its patent—in all four countries and that it could knock out its claim but that both could be hurt. So suspicious was Gegauf of Singer's motives that it drew a draft agreement consisting principally of promises by Singer not to copy its (Gegauf's) machine; it appears that the Gegaufs took a personal pride in it and attached a special value to it.

A license agreement between the parties was finally entered into on April 14, 1956. At that time Gegauf informed Singer that it had called Vigorelli and told him of the agreement. Reporting on the meeting at which the license agreement was signed, Waterman related that Mr. Gegauf said that he had called Vigorelli to inform him of the agreement he was about to sign with Singer.

The first part of this Singer agreement with Gegauf listed the Singer owned Harris Patent No. 2,693,778 and reissue Patent Application No. 516,059 and nine specified corresponding foreign patents and applications (British, Belgian, Canadian, French and Italian and four patent applications: Canadian, German, Japanese and Swedish). It also listed the Gegauf Swiss Patent No. 310,-788, and the Gegauf Italian and German patents Nos. 501,172 and 1,707,338 respectively; and the United States and German applications Nos. 358,377 and 11,654 respectively. A preamble recited that the parties acted in realization of the fact that interference proceedings were about to be opened in the United States between the Singer owned Harris reissue application and one or more Gegauf patent applications corresponding to its listed patents and patent applications. The parties agreed not to do anything to restrict the scope of the claims of the other in any country relating to the subject matter of the listed patents and patent applications. Although the language is quite broad, this provision was interpreted and intended by Singer and Gegauf to mean that neither would file opposition, i. e., nullity and invalidation proceedings against the other's applications in foreign countries where such special proceedings were known. It was also agreed that each would, in accordance with laws of the particular Patent Office, facilitate the allowance to the other in any country of claims "as broad as possible" relating to the sub-

ject matter of the enumerated patents and applications. Here again, although the parties speak of "any country" the only place where such a provision was significant (at least as far as Singer was concerned) was in the United States where Singer knew Gegauf's application preceded Singer's Harris patent and re-issue patent and where it felt sure Gegauf would be awarded the claim as filed. In effect, all that Singer agreed to do was not to attempt to obstruct what it had no power to prevent and what in fact it knew Gegauf would eventually be awarded under the United States laws on the ground of priority. There was nothing illegal in this. We know of no rule of law which would make such abstention under the circumstances here illegal; and this is so even if Singer could have blocked the issuance of the United States patent to Gegauf. We have found no decided case (and none has been cited) which holds that one must contest with a competitor for priority in the Patent Office every time a claim is filed which affects his own patent.

In the agreement in paragraph 2, Singer also agreed not to attack Gegauf under any of its enumerated patents and not to challenge the construction of its "Bernina" sewing machine. As far as the United States was concerned, immunity to Gegauf would follow from the awarding of the United States patent to Gegauf. It was reported by Singer that it felt it was giving up something of value in Canada where Singer had an application pending filed June 22, 1955 which it hoped might issue on a broad claim, and in France where Singer had obtained a patent on a broad claim on June 5, 1953. Why it should feel so is not clear in view of the fact that these applications were filed after the Bernina, but that question need not detain us since it is Singer's intent and motive with which we are concerned, and not the soundness of its reasons.

And in the following paragraph 3, Gegauf agreed not to attack Singer directly or indirectly in any country on the basis of its enumerated patents. This simply meant that Gegauf would not take steps to prevent Singer from manufacturing and selling the "319" and "401" in any country where he had filed patent applications by charges of alleged infringement.

These paragraphs 2 and 3 were the essence of the agreement and were considered so by the parties.

By paragraph 4, Singer agreed not to construct a slavish copy of the "Bernina" machine, as a whole or of the mechanism it included. The significance of this was in the fact that Singer had not yet put its machine on the market and that it made this promise to allay the fears of Gegauf of piracy of its design.

By paragraph 5, Singer undertook, on request of Gegauf, to give to Gegauf "the amical assistance of its patent attorneys for the defense of any of the above mentioned Gegauf patents or patent applications against *an action in cancellation*." Singer was reluctant to enter into this undertaking because it feared that it might appear that the parties were acting in collusion. However, at Gegauf's insistence, the clause was included; but all that Singer felt obligated to do under this paragraph was give Gegauf "an opinion" as to the merits of a challenge in the event its patents in a foreign Patent Office were attacked as invalid. Under no circumstances was Singer prepared to, and the agreement did not obligate it to legally assist Gegauf in a suit to assert its patents. It was Singer's position that if he wished to sue someone "that was entirely up to Mr. Gegauf."

As we have noted, this agreement was limited to the Harris patent; no mention was made of Singer's Perla or Johnson patents because Singer was not anxious to have Gegauf know of its "319" machine.

And, finally in paragraph 6 of the agreement, it was agreed that each would tell the other prior to the execution of the instant agreement of any other agreements concerning the enumerated patents and patent applications. In compliance with this provision, the parties exchanged the information which was already known

to them both: that each had an agreement with Vigorelli; and that Singer had agreed not to sue Vigorelli on any claim that it might obtain on the Harris application.

We find that the agreement constituted the entire understanding of the parties; that there was no agreement or understanding about how each would prosecute, license or otherwise restrict its ownership of any patents it might obtain—or that eventually Singer would purchase the Gegauf patent. Although Singer had the idea very much in mind, it did not think it advisable to mention it to Gegauf at that time. Although Vigorelli knew that Singer and Gegauf had entered into an agreement, there is absolutely no evidence that Vigorelli was in any way instrumental in bringing the parties to agreement. In truth, it was Gegauf who told Vigorelli that it was negotiating an agreement with Singer; Singer did not mention the matter to Vigorelli nor did Singer ever express its hope of acquiring the Gegauf patent.

The undisputed facts support no conclusion other than that the underlying, dominant and sole purpose of the license agreement was to settle the conflict in priority between the Gegauf and Harris patents and to secure for Singer a license right under the earlier patent in order to free the marketing of its "401" and "319" machines in various countries, particularly in the United States where enforcement of the Gegauf patent might very easily have foreclosed the market to Singer. As to this Singer had much to lose for Singer had spent considerable money developing these machines.

And, we find that Singer had a secondary purpose; it was the only one disclosed to Gegauf, and in fact the very one used to convince Gegauf of the advisability of entering into an agreement. It was Singer's desire to obtain protection against the Japanese machines which might be made under the Gegauf patent; this sprang from a fear which Singer had good reason to believe to be well founded.

*c. Singer-Gegauf assignment.*

 Following the Singer-Gegauf negotiations and on April 20, 1956, Waterman went to Italy and there met with Vigorelli. He wrote that "what Vigorelli had on his mind was that now that Singer, Gegauf and Vigorelli had arrived at certain agreements, they should thereafter act in concert against others"; that such a suggestion Singer "very promptly said was out of the question", and that the best thing was "for each one to prosecute his own patents and take care of any cases of infringement that might appear"; that that "certainly would be Singer's attitude with respect to the patents that it owned"; and that upon learning that there "could be no joint action" the subject was dropped.

Vigorelli was told by Waterman "in very general terms" of the agreement with Gegauf but not of the special provisions forbidding Singer from duplicating Gegauf's machine. The result of the conversation and the meeting was that Vigorelli understood that it was Singer's position that each must prosecute his own patents and that Singer could not help Vigorelli in that respect. It was at this meeting that Singer began to lay the foundation for an approach to Gegauf by Vigorelli relative to the acquisition of its patent. It was Singer's opinion that "pressure in the right direction" was what would bear fruit. It was also at this time that Singer discovered an earlier Belgian patent owned by Messerschmitt embodying the mechanism of its 319; and as Stanford expressed it Singer had been "topped again".

Stanford and Vigorelli's patent attorney Majnoni had a friendly discussion during which Stanford expressed concern over the success of its Harris-Gegauf interference and over the position of Gegauf and its ability to successfully assert its patent in the United States. Stanford stated that Singer had not approached Gegauf on the matter of acquiring the application because Singer thought the price would go skyhigh. The conclusion of the talk was that

Majnoni, who was friendly with Gegauf's patent attorneys, was to mention to them that Singer, if it had the Gegauf patent, could "best handle the patent situation." The services of Vigorelli were used by Singer, because Singer knew that Vigorelli was better acquainted with Gegauf's people, and that Gegauf was somewhat mistrustful of Singer's motives and might react more favorably if the suggestion came from a source other than Singer.

On June 19, 1956, Singer's Italian representative reported to Waterman that he had received a letter from Majnoni in which the latter said that he had spoken to Gegauf's attorneys about the advantage of having the Gegauf application assigned to Singer in such a way as to "prompt an initiative to this end by Gegauf". He added that he had left the matter up to Gegauf, but assured Singer's attorneys that the matter was discussed "without in any way letting it be known that your (Singer's) firm was aware of the advances which would be made". In these negotiations and to this limited extent Vigorelli's patent attorney was acting as Singer's agent. There is no evidence, however, that his authority extended to anything more than to effect a rapprochement between Singer and Gegauf.

Subsequently, and in September 1956, Singer was advised by its Dr. Lando that, according to Majnoni, Gegauf's "mind has been directed" to the convenience of transferring its United States application to Singer by the fear that there was a United States patent which might anticipate and invalidate Gegauf's German patent and that such patent might have been disclosed by Vigorelli's United States application; that Vigorelli might agree to withdraw its United States application on condition that the Gegauf application be placed at Singer's disposal for broader protection in the United States by Singer's invoking the Harris and Gegauf patents. Dr. Lando also advised Singer that Gegauf was still suspicious of Singer's motives regarding its patent and needed reassurance.

Early in August 1956 the matter of Singer's purchasing the Gegauf United States application had been directly broached to Gegauf by Waterman and Stanford on the occasion of a visit by Gegauf, Jr. to the New York Singer offices. At this meeting, Singer emphasized the legal and practical difficulties of enforcing a United States patent against the large number of infringing imports which were coming into the United States.

In September Gegauf wrote Singer favoring the idea of doing something "against Japanese competition" in the United States. Singer replied that an arrangement could be reached "equally advantageous to both", and that it would be helpful if Singer were to be informed of the status of the Gegauf United States application. Singer gave assurance to Gegauf that this disclosure was for the sole purpose of reaching an agreement.

A conference was held in Landau, Germany, on September 23, 1956 attended by Gegauf, Sr., Gegauf, Jr., other directors of the Gegauf Company and Waterman and Stanford. Gegauf, who placed great importance on its United States claims, wanted $1,000,000 for its application but would consider $250,000. As this sum was more than Singer was willing to pay, Stanford ended the negotiations "on a friendly basis."

On August 22, 1956, the Patent Office had declared an interference between the Harris reissue and Gegauf applications. Not having heard from Gegauf, Singer wrote in October 1956, suggesting that they settle the interference in accordance with the terms of their license agreement so that the prevailing party could secure a valid patent. Later and on March 15, 1957, Singer abandoned the interference set up between Singer's Harris claim and the Gegauf claim. On April 1, 1957, the Patent Office dissolved such interference.

During the interval, nothing further was done by Singer toward securing the Gegauf application; however, when Singer was notified in September 1957, that its

Harris reissue application was about to issue as a patent, and presuming that Gegauf's patent would soon issue, Waterman approached Gegauf. At this time, Waterman pointed out that since the patents were about to issue, their mutual interests required that something be done to protect themselves from the Japanese infringing machines. Waterman also, quite correctly, pointed out that, under their license agreement, neither was in a position alone effectively to protect its respective patent. Waterman suggested that although he had not planned to go to Switzerland, he would endeavor to meet with Gegauf. To this Gegauf replied that he would be happy to meet Singer to discuss "mutual enforcement" of its United States application and the Harris reissue against "infringing products of the foreign manufacturers."

Although the declared purpose of the meeting was enforcement of their patents, Waterman came to it with two agreements—one, providing for an outright sale of the Gegauf application in exchange for a single lump sum payment; and the other, providing for a sale in exchange for a license back and yearly payments. The first agreement gave Singer irrevocable title to the application and freed it from the necessity of "dealing any further with Gegauf in connection with this general subject." The second agreement would have had the advantage of enabling Singer at any time to terminate the agreement and revert back to the license only, with no need for further payments.

Both of the proposed agreements related solely to the Gegauf United States application, which was also the subject of the license agreement.

On October 16, 1957, Waterman and his patent attorney met with the Gegauf people to discuss the assignment which would give Singer "complete ownership" of the patent and in return license Gegauf to build and sell machines. Singer endeavored to give the impression that the "subject was not overly important" to Singer. Waterman reported that the price agreed on for the outright purchase

of the application was reached only after considerable discussion; it was $40,000. Singer expected that an agreement "if not already reached" would be finally settled shortly.

But, Gegauf was not so willing as Singer had assumed. Within the week Waterman was reporting to Stanford that the $40,000 had risen to $125,000 for a lump sum payment, or $25,000 per year, as long as Singer kept the patent, with a minimum duration of the agreement of 3 years. He also sent word that Gegauf insisted on the right to license three companies and did not wish the divisional claim assigned to Singer as it intended to license that to some interested European company. Gegauf had carved out of its original patent application a divisional application which was filed on December 2, 1957. Waterman instructed Kirker, Singer's Swiss patent attorney to pass the word to Gegauf's patent attorney "without making any comment on the first two conditions" that the refusal to assign the divisional claim would almost surely make the agreement impossible as "we all along were discussing application including divisions", that either standing alone was "weak". The Government makes much of this word, which on the telegram (Govt. Exh. 50) appeared as "leak", to support a finding that defendant was plugging up "leaks" in its patent wall. We think it more probably a spelling error, but either way find no significance in the word. Singer replied that the value of the Gegauf patent greatly decreased when other people were licensed; that it understood that Vigorelli was a necessary licensee, and that it favored the plan of $25,000 yearly and that the "divisional claim must be included."

The following day Kirker reported Gegauf's position to Stanford. Gegauf was insistent that the agreement must relate only to the basic application and that "the divisional application will not be included." Gegauf had the idea that European companies were highly interested in the divisional application and that it could sell this to them. Kirker

also related to Stanford that Gegauf wished to be informed when Singer intended to sue a European company for infringement of the patent; that he pointed out that it would be better to set forth the condition in another form, viz. to include in the agreement the name of the companies which Gegauf had in mind, and to restrict said condition to such companies. Kirker also reported that the amount to be paid had been discussed: $125,000 for a single payment or $25,000 per year for a minimum of three years. Kirker had then expressed the opinion that the amount suggested was extremely high but that probably an agreement might be obtained on the basis of half these sums; that the $40,000 mentioned by Singer was considered a minimum. He summed up Singer's position as being all or nothing at all: "No question of two separate agreements and two separate payments."

In the meantime, talks were suspended while Stanford and Singer's patent department obtained from Gegauf's patent attorney copies of the basic and divisional applications to study them to aid them in reaching a decision.

At this examination Singer discovered for the first time from Gegauf's United States patent attorney that there were three United States applications relating to zigzag mechanisms; the first was the basic application No. 358,377 (this was issued April 29, 1958 as Gegauf I— Patent No. 2,832,302), in which Singer was vitally interested; the second it believed but was not sure, related to the idea of having "two zigzag mechanisms" for "shifting at the will of the operator from one mechanism to the other" (if this was the "divisional" application which Gegauf had in mind, Singer stated that it had no interest in it and did not require it to be included in the agreement); the third application, which was not filed, interested Singer because it disclosed and claimed vital and essential material taken from the application No. 358,377.

With respect to the desire of Gegauf to be consulted before Singer instituted

infringement suit of Singer against European manufacturers, Singer stated that "if necessary", it would agree to permit Necchi and Pfaff in addition to Vigorelli (who was already licensed) to sell their machines in the United States without charge of infringement. Stanford authorized Kirker to go as high as $75,000 for the "outright sale" of the patent application although it felt it should pay only $62,500. Kirker then suggested to Stanford that he have an interview with Gegauf and his attorney.

This interview was held and revealed that the position of Gegauf had been considerably altered since Stanford's visit (a month before). Gegauf's position now was that while it had no objection "to making an agreement with Singer, in order to stop as far as possible Japanese competitors in the United States market", it was willing to do so only under certain conditions. First, that Singer would not manufacture under the Gegauf application. This condition was the result of an objection made by Gegauf, Jr., that perhaps Singer was interested in acquiring the Gegauf application not to act against competitors but rather to be free of infringement claims by Gegauf. Second, Gegauf insisted that it retain the right to sub-license "one European company" out of a list of European companies. Finally, Gegauf stated that the $125,000 asked for the application and the divisional application was cheap and that it could not go lower since it could get more money if it licensed the invention. Kirker replied that there was no comparison since a sale to Singer was insurance against common competitors and that was why Singer was willing to pay. Gegauf asked Kirker to make a definite offer, to be rejected or accepted, closer to $125,000 than to the $40,000 proposed by Singer, declaring, however, it would not bargain. This came as a surprise. Singer had been led to believe that Gegauf would reduce his figure considerably. Kirker told Gegauf that he could go no further with the discussion because he was not authorized to do anything but offer $40,000 as a maximum. What was

bothering Gegauf throughout was his fear that if Singer stopped the Japanese infringements in the United States with the Gegauf patent, they would go to Europe where Gegauf was not in as good a position to stop them because his application had been filed in but four countries and the divisional application had been filed nowhere in Europe.

Kirker was of the opinion that, due to Gegauf's attitude, Singer might have to go as high as $100,000 and that, although Singer might offer $75,000 and then $85,000, Gegauf would make no substantial concessions.

The policy of Singer was to obtain such control of the Gegauf application as would put it in a position to get the very best patents "to bar imports which would violate these patents", while the elimination or curtailment of European imports was "an important but secondary objective". Singer was, naturally, most reluctant to grant licenses to the Europeans and resolved that, if it had to pay Gegauf a higher price it would try to limit the number of licensees, aware that these licensees would lessen the value of the patent.

From the report of Stanford's meeting with Gegauf, it was apparent that, although Singer had been at great pains to conceal its interest and need for the Gegauf application, Gegauf was not misled or in the dark and had no intention of finally closing with Singer at a cheap figure. In order to fortify his vantage position, Mr. Gegauf retreated to the surroundings of his own home on a pretext of illness, thus obliging Kirker and Stanford to follow him there for the interview instead of meeting them at the plant in Steckborn as had been previously arranged. That Singer was aware of the employment of this strategy is evident from Stanford's statement that they "privately doubted the illness" of Gegauf and Gegauf looked "quite hale and hearty." Although Singer was most anxious to conclude the assignment, it decided to assume an offensive position rather than petition, and began the negotiations by questioning Gegauf on its

patent protection in Europe. Singer also put these questions in an attempt to find out whether Gegauf knew of any other patents which might affect the Gegauf patents which Singer sought. In addition, Singer maintained that under the license agreement it had the right to manufacture under Gegauf's divisional application as well as under the original application. Gegauf's son argued that, since that agreement had been signed at a time when an interference was pending between the patent applications—the license ran only to the disputed claims and not to the patent application as a whole. He then advanced the argument that, if stopped by Singer in the United States, the Japanese manufacturers would run to Europe; to this Singer answered that a greater risk was run in Europe if Singer were not permitted to first stop infringements in the United States. Gegauf asked that there be a provision that Singer assist Gegauf in actions under his patents against his competitors in Europe. Singer, however, rejected this proposal. The matter of licensing was then taken up. Singer "avoided giving a license to a third party" under the patent it hoped to obtain, by agreeing not to attack the importation by Vigorelli and Pfaff without Gegauf's consent; and to Gegauf went the right to sell its Swiss-made machines in the United States.

After "considerable thought," Singer, at Gegauf's request, then made its offer of $75,000 in Swiss francs because they had a "larger sound". Gegauf countered with $125,000 and Singer after considerable discussion brought him down to $100,000. Singer continued "to drive home the point" that Gegauf stood to benefit more by enforcement of the patents in the United States because the "Brother Pacesetter" machine, a big selling and patent infringing Japanese-made machine, was in direct competition with the Gegauf machine, for both machines were of the free arm type. This was not so with respect to Singer, for it made the flatbed type machine. The point apparently reached home, for Gegauf "suddenly" offered its application to Singer

418

free of charge, if Singer would agree for the next five years to sell 10,000 of Gegauf's free arm machines in its shops. Stanford expressed doubt that Singer would be willing to do this unless it could get an exclusive distributorship. A response came with alacrity that, in fact, Gegauf was thinking of changing its agents in the United States. Stanford promised to discuss the proposal with Singer's executives and then quickly brought the conversation back to his principal objective—"patents and patent questions".

A price was finally agreed on at $90,-000. Prior to parting, Stanford stated that Singer would not sell Gegauf's machine under the Bernina name in its shops and Gegauf informed Stanford that it could not give Singer an exclusive agency. The agreement assigning the patent application and the division, was drafted by the Singer people the next day and a check for $90,000 was drawn on a Swiss bank to the order of Gegauf.

Gegauf then on December 5, 1957 assigned to Singer its United States application No. 358,377 and all right in the inventions claimed therein and to all United States patents which might be granted thereunder.

The assignment did not recite the divisional application because its filing had been too recent. It was the intent of the parties, however, that the divisional application would also be assigned. The accompanying agreement executed the same day, after reciting the continued existence of the prior license agreement mutatis mutandis, and the assignment by Gegauf to Singer of United States patent Application No. 358,377, and to the divisional application carved out of this application which had been filed just prior to the agreement provided that in consideration of the sale, Singer would pay Gegauf $90,000 and that Singer would grant Gegauf a non-exclusive royalty free license to sell in the United States sewing machines made in Gegauf's own factory in Switzerland which were of the type disclosed in the assigned patent applications. Singer also agreed

not to institute, without the consent of Gegauf, legal proceedings asserting the patents when issued against Pfaff in Germany or Vigorelli in Italy, with respect to sewing machines manufactured in their respective German and Italian factories. Singer further agreed not to make a slavish copy of the Bernina machine as a whole or of its mechanism. Gegauf undertook to assist Singer, at Singer's expense, in procuring a valid patent based on the applications.

With the exception of these specific limitations on Singer's right to assert the Gegauf patent when issued, no agreement was made or understanding reached by the parties with respect to the licensing, enforcing or use of their patents. These writings were the entire agreement of the parties.

If one were to describe the attitude of these alleged "conspirators" throughout, it would have to be in terms of suspicion, wariness and self-preservation. It is most striking that, throughout, their dealings were characterized by an absence of unity or identity of any common purpose or motive. Singer's sole interest was to protect its "401" machine against all infringing machines. Poller v. Columbia Broadcasting, 368 U.S. 464, 476, 82 S.Ct. 486, 7 L.Ed.2d 458. This extended not only to machines originating in Japan but everywhere, including Europe. Singer was not concerned with the effect upon Gegauf in Europe as long as it did not affect Singer products in the United States. Gegauf's prime interest was the protection of its machine in Europe from Japanese infringements— a danger which it was far from risking for the sake of dealing as it did with Singer. Gegauf gave but little weight to what might happen to Singer in the United States so long as Singer's danger did not affect Gegauf in Europe.

By far the largest number of infringers of the Gegauf patent and invention were the Japanese. Gegauf was conscious, as were all in the sewing machine business, of the growing inroads of Japanese machines in the markets all over.

Gegauf knew too that a number of these machines would violate the patent that would issue on its application.

Singer had told Gegauf, with complete frankness, that the reason Singer wanted the Gegauf patent was that Singer could enforce it better than Gegauf could. Gegauf well knew when it negotiated with Singer concerning the transfer of the patent that Singer expected upon acquisition to enforce the patent and that enforcement would most certainly include Japanese manufacturers who were the principal infringers. Singer stated that it was willing to pay a substantial sum for the patent so that it might enforce it.

The fact, however, that Singer had this unconcealed purpose and intent and that Gegauf knew or was advised of it does not spell out or sustain an inference that there was an unlawful conspiracy or agreement to exclude or not license one particular competitor; nor does the fact that Gegauf shared with Singer a common concern over Japanese competition. The fact that there may exist a motive for a conspiracy does not establish its existence; inferences of this nature may not be supported on a foundation built alone on the sands of suspicion.

Nor does the fact that the Gegauf patents in the hands of Singer incidentally would inure to the benefit of Gegauf and Vigorelli make their acquisition an unlawful patent pool. Singer acquired the patents only after extended bargaining, and on the best lawful terms it could obtain from Gegauf. While it is true that the use of the Gegauf patents in conjunction with its own patents gave Singer more power over infringements than it would have had with its patents alone, this is so with most patent acquisitions and it is a lawful power which comes to an independent patent owner.

Neither party was eager for the agreement finally made. It resulted from a fixed determination on each one's part to give and pay for nothing more than was absolutely necessary to secure its respective end and to carry on the protracted negotiations as distantly as possible.

A like observation may be made with respect to Vigorelli. Singer made use of Vigorelli's knowledge and experience in dealing with Gegauf in its preliminary negotiations concerning the acquisition of the Gegauf patent. There is no evidence that Vigorelli played any further part in realizing Singer's purpose or that it was even kept informed of the progress of the negotiations.

No agreement or understanding was reached by Singer and Vigorelli at any time that Singer would acquire any patent or that Singer would license, enforce or restrict in any way its ownership of any patent owned or which it might acquire.

As a nonexclusive licensee of a United States patent owned by a foreign manufacturer who had neither committed himself nor authorized Singer to protect the patent from infringement and whose principal interest lay in Europe, Singer in the United States felt at the mercy of infringers. Singer thus realized the need for independent ownership of the patent.

Singer admits that a copy of its "401" machine could be excluded under the Johnson patent, which patent was a result of its own research. However, it felt that a copy of the "401" machine modified only to the extent of removing or immobilizing one of its two followers would not infringe the Johnson patent and that, therefore, the acquisition of Gegauf No. I which covered the idea of a single cam follower which might be engaged with any one of the cams, was necessary to exclude such a modified copy of the "401" machine. Whether in fact it did need the patent to protect its machine, is unnecessary to determine for we find that this was the motive behind the acquisition.

The purpose behind Singer's insistence in acquiring the Gegauf divisional application which issued as Gegauf II was the need to protect a cross-license agreement it had entered into on April 16, 1957

with Messerschmitt giving the latter the right to sell Singer's "319" multiple cam machine covered by Singer's Perla application. The Gegauf divisional application, which had priority over Perla, disclosed and claimed the same type of mechanism as that embodied in Messerschmitt's machine and Singer's "319," with the difference that the Gegauf II mechanism was incapable of combining *intelligence from two cams* simultaneously to produce a zigzag stitch. Singer felt that unless it acquired this application, Gegauf would obtain a patent based on this application by the use of which it could block Messerschmitt's sales of *its* multiple cam machine in the United States, and subject Singer to a suit for breach of contract by Messerschmitt. However, since Singer was dealing unilaterally with each company, Gegauf did not know this. Singer refrained from telling Gegauf why it needed the divisional application, fearing that the price, already high, would be that much higher if Gegauf were informed.

We find that Singer's motive in acquiring the divisional application was not only perfectly consonant with good business practices, but was entirely lawful. This brings us to the Messerschmitt agreement.

### d. *Singer-Messerschmitt license agreement and subsequent assignment.*

■ Although Messerschmitt is not named a co-conspirator, the dealings Singer had with it are claimed by the Government to further evidence Singer's intent and reflect its state of mind to acquire broad *patent protection in order* (1) to further the common design of the three conspirators to unlawfully exclude Japanese imports; and (2) to help Singer achieve a monopoly and unlawfully exclude all competition.

The events leading up to the Messerschmitt license were as follows. While Singer at the end of 1956 was in the midst of tooling and preparing the manufacture of its "319" machine in the United States and Scotland for worldwide distribution under its Perla patent application, it discovered the Messerschmitt multicam machine. This machine contained, as did the "319", a plurality of cams, each with its own follower—the basic feature of such multiple cam mechanism. We have already noted that Messerschmitt was a German corporation engaged in the manufacture and sale of sewing machines including zigzag sewing machines. Singer had filed its United States Perla application covering the "319" on December 8, 1954, but Singer believed, and with good reason, that Messerschmitt had filed its patent application in Germany prior to that date. Singer entertained this belief even though up to March 15, 1956 it had been unable to locate the Messerschmitt patent or patent application. In the meantime, Singer was filing corresponding Perla applications in twenty foreign countries. The situation became really acute when in 1956 Singer was advised by the German Patent Examiner that he was holding its Perla German application in abeyance because of a prior filed German application, which Singer suspected was one filed by Messerschmitt. Because of its inability to obtain any information on its own, Singer was forced to seek a conference with Messerschmitt. Just before the conference in April 1956, Singer discovered a Messerschmitt Belgian patent with a priority date fourteen days earlier than the Perla United States application, but subsequent to the Perla invention. Thus, while Singer might obtain a patent in the United States which would dominate the "319" machine, Messerschmitt might obtain a patent in many of the foreign countries based on an earlier priority date, thereby exposing Singer to probable infringement liability to Messerschmitt in many countries where it planned to manufacture or sell its "319" machine.

At this time, Singer was tooling and otherwise preparing to manufacture the "319" machine in Italy. Italian patent counsel advised Singer that the "319" machine infringed the Messerschmitt Italian patent as issued. The infringement, Italian counsel advised, lay in the fact that the Messerschmitt patent dis-

closed the idea of a plurality of cams, each with its own follower, and that under Italian law such disclosure established the scope of the patent. Counsel further advised Singer that while there was a good chance that the Italian courts would hold that the Messerschmitt Italian patent had been anticipated by prior art, namely Gegauf and Vigorelli Italian patents, there was a litigable issue involving some risk to Singer.

Singer's Italian representative believed that Messerschmitt might undertake legal proceedings to protect its Italian patent. If Singer litigated and lost, Singer would be exposed to substantial liability to Messerschmitt. When transmitting the opinion of Italian patent counsel, Singer's Italian representative expressed the hope that the opinion would help Singer decide "whether or not it would be advisable to include Messerschmitt amongst the signers of the non-aggression pact". The representative was referring to the fact that Singer had made a cross-license agreement with Vigorelli and a cross-license agreement with Gegauf and that the opinion of Italian patent counsel might be helpful to Singer in deciding whether to make a cross-license agreement with Messerschmitt.

That Singer was correct in its appraisal of the Messerschmitt position was borne out by Messerschmitt's attitude at the conference that it would succeed in the United States as well as in other countries. However, after examination of the "319" machine, Messerschmitt agreed that, since their respective machines were identical in essential principles, an amicable settlement would be to their mutual benefit as neither of them would profit from litigation.

Here again, the record discloses that the relation between Singer and Messerschmitt was far from intimate or confidential. Messerschmitt was full of confidence that it would prevail over all with its patent. Singer, in order to deflate this confidence of Messerschmitt, was pushing especially hard on its "Perla" United States application. Singer hoped that thus it might have an interference

declared between the Singer and the Messerschmitt United States applications and thereby gain more bargaining power.

Because of its earlier invention date, Singer felt confident that it would prevail in the United States in its Perla application in spite of its later filing date and that, as soon as Messerschmitt learned of the interference (of which Singer did not inform it), Messerschmitt would come to Singer; but the converse of this would be true in Europe because of Messerschmitt's prior filings.

Singer's confidence, however, suffered a severe blow when in May 1956 it discovered that Messerschmitt had filed in Great Britain, the very country in which Singer was tooling its machine. Although the meeting with Messerschmitt was scheduled for August 1956, Singer kept putting it off until September 1956, to make sure that by that time Messerschmitt would learn of the interference Singer was anticipating between their respective United States applications. This interference was declared by the United States Patent Office on September 17, 1956. The interference involved a mechanism by which information is taken from each of a plurality of cams by its own follower.

A meeting was held subsequently at which the parties agreed to settle their patent conflict by cross-licensing. Pending the meeting, Singer withheld filing opposition to Messerschmitt's German patent application. This German application related to a construction of a manually operable means for controlling the lateral motion of the needle of a zigzag sewing machine. This was a construction which Singer had good reason to conclude was anticipated by the Singer-owned Tiesler German patent, which was about to expire. Singer, however, saw to it that Messerschmitt was advised of its claim of anticipation and of Singer's position that Messerschmitt's machine infringed the claim of the Tiesler German patent. Singer hoped that by this step it might bring Messerschmitt to a point where its attitude might be more conducive to fair bargaining. At this time

Messerschmitt was becoming more difficult in its demands. In fact, Messerschmitt had stated that it would enter into no license agreement with Singer unless Singer agreed to let Messerschmitt manufacture machines for Singer.

On December 11, 1956, the Singer Patent Department drew up a report on the infringement status of the Singer "319" machine throughout the principal countries of the world. The report stated that:

(1) the "319" machine infringed recently issued Belgian and Italian patents owned by Messerschmitt. Messerschmitt had corresponding applications in Germany and Great Britain, and it could be fairly presumed that patents would soon issue in those countries.

(2) Messerschmitt had a corresponding application in the United States which was on the date of the report involved in interference with Singer's Perla application. Singer expected to prevail in this interference proceeding and receive claims that would cover the "319" machine and be infringed by the Messerschmitt machine.

(3) The question confronting Singer was what action it should take in connection with Messerschmitt so that Singer could freely manufacture and market the "319" machine in Germany, Belgium, Italy and Great Britain.

(4) It would be to Singer's advantage to have a cross-licensing agreement executed with Messerschmitt as soon as possible in view of the present or potential infringement of the "319" machine in Italy and Great Britain.

(5) Messerschmitt undoubtedly realized that it would lose the United States interference proceeding and that its machine would be subject to an action for infringement by Singer, based on several Singer-owned patents.

Because of the inability of the parties to agree, Singer obtained a postponement of the Perla interference for Messerschmitt. Singer, however, directed immediate filing of opposition to the Messerschmitt German application. Singer went farther and explored and investigated the legal possibilities of a law suit against Messerschmitt on the Singer German patent, even though it had expired. As Singer's Patent Department described it, the situation contained all the ingredients for "a patent poker game with each party holding a good hand".

It was the opinion of Singer, however, that rather than lose its present market in the United States, and be in a position where it would have to enforce its patent against Singer in Great Britain and Italy, Messerschmitt would be willing to exchange royalty free licenses in Europe in exchange for a royalty free United States license, and this without insisting upon any further business promises of Singer.

In March 1957, Messerschmitt sent Singer an executed cross-licensing agreement which however was not acceptable to Singer for it failed to specify the machines to be licensed by Singer. A revised agreement was executed specifically limiting the license granted; and now we consider this revised agreement.

Under this agreement of April 16, 1957 made with Messerschmitt, Singer agreed not to bring any infringement action against Messerschmitt under the rights derived from patents issued or to be issued in any country with respect to subject matter disclosed in three annexed drawings which disclosed (1) a manually operated zigzag sewing machine, (2) a straight stitch sewing machine, and (3) a machine carried multiple cam zigzag machine. Messerschmitt in turn granted to Singer a license to manufacture and sell sewing machines embodying subject matter disclosed in Singer's two German patent applications, which disclosed the Singer "401" (Johnson) and "319" (Perla) machines.

The agreement permitted each to continue to manufacture and sell its respective machines without interference proceedings and protracted and expensive patent litigation, and without royalties. It ensured this for Singer and Messerschmitt agreed not to institute any opposition, nullity or invalidation proceedings against each other's patents or patent ap-

plications corresponding to Messerschmitt's constructions as illustrated in the drawings annexed to the agreement and to Singer's German applications and to settle any Canadian or United States interference. This provision was identical to that found in the Vigorelli agreement which we have found to be in all respects legal. There was no other understanding between the parties with respect to the licensing, enforcing or other use of their patents.

The freeing of the "319" machine from any claim by Messerschmitt without payment of royalties was extremely important since at that time Singer was selling its "319" machines at the rate of 65,000 per year in Europe. As a result of the agreement, Singer was not only free to continue to sell its machine but was released from all claim of liability for past infringement.

Complying with the understanding, Singer withdrew its interference to the Messerschmitt German application on the manually operable means.

It is conceded by the Government that Singer's reason and motive for entering into the license agreement with Messerschmitt was to free its "319" machine from any of Messerschmitt's patents. It contends, however, that, without the concerted action of Messerschmitt, Singer alone was acting in the accomplishment of the alleged conspiratorial purpose when Singer attempted to obtain an assignment of all Messerschmitt's patent applications and thus place Singer in a position to exclude others. The Government urges that although Singer acquired Messerschmitt's United States application but failed to acquire the patent, its attempts are evidence of this purpose and also of its intent to monopolize. The intent to monopolize is particularly evidenced, says the Government, by the fact that the Messerschmitt patent application No. 548,481, which Singer acquired, encompassed more than was necessary to protect the "319" and "401" machines —namely, an automatic feeding mechanism which was not part of any machine Singer was then manufacturing or con-templating doing so (but in which it was interested for future development).

Under the assignment executed June 4, 1957, Messerschmitt assigned to Singer its United States application No. 548,481 in exchange for a non-exclusive, non-transferable, royalty free license to manufacture and sell sewing machines disclosed in the application or any patent which might be granted on it and for Singer's further agreement to use its best efforts to prosecute the application in order to acquire a good and valid patent if possible. The rights of the parties under the license of April 16, 1957 were specifically reserved, including the right in each party to license anyone else under the specified machines.

The Messerschmitt United States application had claims of a dual nature: (1) a stack of cams for controlling the lateral vibration of the needle bar which was common to the Singer Perla application and to the "319" machine; and (2) a claim which was not common to the "319" or any of the three machines drawn in the license agreement—i. e., a stack of cams used to control the feeding mechanism. Since neither the "319" nor the Messerschmitt machine embodied the latter concept, the license which Messerschmitt had given Singer did not encompass this mechanism. What Singer received therefore under the assignment was something in addition to that which it had received under the license agreement.

Following the assignment to Singer, the interference between Messerschmitt application No. 548,481 and the Singer Perla application was dissolved since Singer then owned both applications. On October 22, 1957, the Perla United States patent issued to Singer. Singer in accordance with its agreement did prosecute the subject matter of this Messerschmitt application, i. e., the feed mechanism, but was unsuccessful in obtaining a patent on it after several rejections, and accordingly abandoned it. Messerschmitt, when it assigned its application to Singer, gratis, was fully aware of the dubious-

ness of the claims which Singer at its own expense undertook to prosecute.

There was no agreement or understanding between Singer and Messerschmitt, and there was no promise or commitment made by either, that was not expressed in this agreement.

Singer then proceeded to negotiate for the acquisition of the foreign patents and patent application corresponding to the United States Messerschmitt application. In exchange for these, Singer was willing to prosecute these applications, pay the cost of obtaining the patents which had issued to date and the yearly fees for their maintenance and grant to Messerschmitt a license under each patent. Since Singer already had some twenty foreign patent rights concerning the Perla and "319" multicam zigzag mechanism, it was Singer's purpose to consolidate all these patents (its own twenty and Messerschmitt's ten patents covering multicam zigzag mechanism) in its hands in order that it might more diligently police and enforce the patents and protect the "319" machine. Although the expense of the acquisition of these was high and although Singer was licensed to sell in all these countries, it was thought worthwhile "if of any value to restrict Japanese especially Brother."

The proposal was first made in July 1957. Later, in October 1957 a draft agreement covering ten of Messerschmitt's foreign applications had been drawn up by Singer and submitted to Messerschmitt for approval. The patent applications which Messerschmitt was thought willing to assign included, among the zigzag mechanism, claims covering "certain reverse feeding means in connection with some other mechanisms of an automatic camblock machine". The claims would be the first of this kind to be owned by Singer; they would constitute a worthwhile supplement to Singer's "automatic zigzag machine patents" even though they were considered as "not fundamental", except to the particular mechanism of the Messerschmitt style machine.

Although Singer was willing to pay for these patents, Messerschmitt was interposing stumbleblocks. During these negotiations, Messerschmitt had proposed that it be given an exclusive license with the right to sublicense with specific territories allotted among such sublicensees. This proposal of Messerschmitt was "pushed aside very quickly" by Waterman of Singer on the ground that it was "under no circumstance acceptable, because this wording would mean a clear infringement of the antitrust law in the United States of America". In retort to the suggestion that such agreement be understood though not expressed, Waterman pointedly refused on the ground that the agreement must be complete and entirely truthful in all respects and that, if it were not, he would "not be able to declare with a good conscience that no additional arrangements had been made."

A flat price of $25,000 was suggested for all the patents and patent applications with an option to Singer to purchase the whole Messerschmitt sewing machine business. Messerschmitt was thinking of selling this for it had not been profitable, and as its anxiety grew Messerschmitt became more reluctant to part with its patents unless Singer also agreed to buy the business. This, Singer was not prepared to do, even though Singer saw no harm in having an option to do so, and in fact, saw some possible good in this, since it would then know something of business conditions at Messerschmitt.

Singer went so far as to tell Messerschmitt that it really did not need Messerschmitt's foreign patents for any new machine in construction or being designed, but that it was interested in acquiring them merely to supplement its own similar patents. Singer renewed its offer of $25,000 and in addition offered to accept Messerschmitt's proposal that in the event of purchase, consent be given to the granting of a license to a possible purchaser of Messerschmitt's business. This was to no avail; Singer never obtained Messerschmitt's foreign patent rights or application corresponding to

United States patent application No. 548,481.

The Government makes much of the fact that the Messerschmitt United States application contained the feed mechanism not embodied in the "319" or any other Singer machine, and contends that Singer's efforts to obtain it despite this fact is evidence of Singer's intent to acquire as many patents as necessary, whether essential to its business or not, to frighten off competition. However, the fact remains and it cannot be disputed that this application embodied the zigzag mechanism of the "319" which issued on the Perla patent and on which Singer had spent considerable time and money. It is also the fact that it was one patent with these two features—one of which Singer needed and one of which it did not need for its "319" but would be happy to get.

Because Singer had been "behind the procession" of industry development and production in the zigzag field and had been anticipated on so many occasions, Singer had decided that good business policy dictated that it pass up no lawful opportunity to keep up with the latest developments. As Singer correctly summed it up when it negotiated the Messerschmitt license, Singer was behind in the zigzag field and Singer was "skating on some pretty thin ice" commercially in its offerings in the market place.

The automatic feed mechanism, Singer had been advised, had good selling points and was attractive to a user. While Singer was not manufacturing such a machine at the time or contemplating doing so, it wanted to acquire the feed mechanism in the event it should decide to do so in the future.

In 1960, Singer did pay Vigorelli $25,000 for a license on a machine incorporating an automatic feed mechanism.

The fact that at the very same time Singer was negotiating for Gegauf's United States application concerning its "401," while interesting, is not significant or indicative of wrongdoing. There is not a scintilla of evidence that either Gegauf or Messerschmitt knew of each other's contemporaneous dealings with Singer. At no time in the dealings between Messerschmitt and Singer was that fact mentioned. The negotiations with Messerschmitt straddled a period commencing prior to its license with Vigorelli and terminating after the assignment of Gegauf I, but nowhere does it appear that Vigorelli or Gegauf played any part in Singer's dealings with Messerschmitt.

2. THE FURTHER EFFECTUATION OF THE ALLEGED CONSPIRACY.

As further proof of the alleged conspiracy, the Government points to the license given by Singer to Sears Roebuck Company under the Gegauf patent, the institution of Tariff Commission proceedings, and the filing of infringement suits by Singer against Japanese imports. The fact that Singer licensed Sears Roebuck Company, and the license itself shows, the Government contends, that the conspiracy was directed solely against Japanese imports because Singer thereby was free and willing to license European imports without consulting Gegauf or Vigorelli but unwilling to license Japanese imports.

The Sears Roebuck license came about from these facts: Sears Roebuck was desirous of importing a West German machine—"Sears Roebuck Model 89"—which it feared might infringe on the Singer Gegauf patents. Singer did not feel that this Sears "Model 89" would infringe any patent which might issue under the Gegauf divisional application, and in fact it so informed Sears Roebuck. It was Sears Roebuck who insisted upon being licensed under both Gegauf patents.

While it was not Singer's policy to license a competitor under a patent, because Sears was a good customer of one of Singer's subsidiaries, Singer "felt constrained to acquiesce to a limited extent in the request for a license" even at a time when such a license might jeopardize its success in the Tariff Commission proceedings.

Under the license executed on January 19, 1959, Singer granted Sears Roebuck Company a non-exclusive, non-transferable license to import and sell throughout the United States machines illustrated therein known as "Sears Model 89", which was covered by Gegauf I and which might be contended was covered by Gegauf II. In exchange for this, Singer received from Sears Roebuck a royalty on each machine to be calculated at the option of Sears under either a minimum total of $75,000 per year or a fixed price of $7.50 on each machine sold. In 1959 Singer received in royalties from Sears Roebuck a total of $116,895 and in 1960, $75,435. In 1961 Sears Roebuck discontinued the importation and sale of any machine covered by Gegauf I and replaced its imports with a zigzag machine of Japanese manufacture.

The fact that in two years Singer received almost twice as much from the Sears Roebuck license as Gegauf collected for the sale of its patent to Singer does not buttress the conclusion drawn by the Government that Gegauf was willing to part with a valuable property right at a low price in exchange for action by Singer against their common competitors. No part of the money which Singer was paid by Sears Roebuck was ever shared with or paid to Gegauf. In fact, Gegauf did not even learn of the license until after its execution. When extending the license, Singer was acting independently and solely in its own business interest of keeping an important customer.

On January 15, 1959 Singer filed a complaint before the United States Tariff Commission alleging it was the owner of Gegauf Patent No. 2,832,302. The complaint prayed that the Tariff Commission recommend to the President that household automatic zigzag sewing machines and parts thereof covered by the claims of said United States Patent No. 2,832,-302 be excluded from entry into the United States for the term of said patent. This led to the Tariff Commission investigation which is still pending. The proceeding before the Tariff Commission was stayed by the Commission upon the commencement of this suit by the Government against Singer and is being held in abeyance by it awaiting the outcome of this suit.

This filing with the Tariff Commission was after the acquisition of the Gegauf patent. It was followed and was the result of a discussion which Singer had with its patent counsel and with an attorney expert in tariff matters, concerning the inadequacy of infringement suits to protect its "401" machine. Before the filing, Singer did not consult with Gegauf or Vigorelli about taking this step. There is no evidence that Singer ever discussed such a step with either Gegauf or Vigorelli during any of its negotiations with them.

From the complaint before the Tariff Commission, it is clear that those proceedings were brought solely to exclude all imports which might infringe Gegauf I, as embodied in the Singer "401," which Singer was manufacturing and selling in great volume. Neither Gegauf patent II nor the Harris patent is involved in the Tariff Commission proceedings.

Numerous defendants were named by Singer in its complaint before the Tariff Commission as importers of infringing machines.

Husqvarna, a Swedish manufacturer of household sewing machines with whom Singer had had business relations for over a century, was one of the named defendants. Because of its long acquaintance and its desire to secure a license from Singer under the Gegauf patent, Husqvarna was reluctant to oppose Singer in the proceedings and instead proposed a "gentlemen's agreement" that if it did not oppose Singer in the proceedings, Singer would at the conclusion of the proceedings grant it a license. Singer declined the proposal. Singer stated that it could not consult with Husqvarna as to what course it should take and that it was not free to enter into any such agreement, but Singer did state that it did not intend to offer any proof respecting Husqvarna's infringement unless the

latter did. The net result of the request of Husqvarna was a tactful refusal by Singer, with the perfectly lawful and understandable reluctance not to alienate a prospective customer with whom Singer had long had business dealings. Husqvarna remains in the tariff proceedings as an alleged infringer; no license has been granted to it. The fact that Singer did not intend to offer proof as to Husqvarna's infringing machine is of no particular or special importance since Husqvarna is but one of 28 manufacturers named in the proceedings. Husqvarna imports amount only to 3,000 machines a year!

Another importer named as a defendant was Phoenix, a West German manufacturer of household machines. Phoenix wrote to Singer denying any infringement on the ground that it had a prior license from Gegauf (a defense which it has not raised before the Tariff Commission). Phoenix suggested a settlement with Singer. Although Singer doubted this license since Gegauf had never mentioned Phoenix, Singer felt it was not then in any position to discuss the question of a license, or become involved in a controversy over the matter of the claimed license, and so informed Phoenix. From this, the Government draws the inference and conclusion that Singer was leaving itself open to license Europeans in the future once it had disposed of the Japanese infringers. Here again, however, there is a lawful inference which can be drawn—that is not to antagonize an adversary and possibly a prospective customer.

Finally, there is the matter which arises from the deletion from the assignment agreement of Pfaff as a European importer against whom Singer could not assert its patent without the consent of Gegauf. While Singer in its complaint before the Tariff Commission had alleged the existing licenses with Gegauf, Vigorelli and the proposed license to Sears Roebuck Company, it had not alleged the agreement with Gegauf with respect to Pfaff. During the hearing before the Commission, Singer was asked whether Pfaff was licensed under the Gegauf I patent to which Singer replied in the negative. Singer felt that the Commission was not convinced of the truth of this and therefore requested Gegauf to execute a revised agreement deleting Pfaff's name and all reference to Pfaff. The sole motive and reason prompting this deletion was very plainly and unequivocally expressed by Singer; it was that Singer might "have a better chance of prevailing before the Tariff Commission" in its efforts to exclude all machines which infringed on Gegauf I. Gegauf consented on condition that the name of Phoenix be substituted for Pfaff. Gegauf explained that prior to the 1957 assignment to Singer, it had in 1955 licensed Phoenix under its German patent for the area of West Germany and that, although Gegauf did not believe that Phoenix had any right under Gegauf I in the United States, it was worried that Phoenix might seek damages against Gegauf for not reserving rights to it under the Gegauf patent in the United States. However, Gegauf offered, in the event that this arrangement was not satisfactory, to consent to the deletion on the explicit condition that Singer assume all legal consequences and to that extent protect Gegauf.

While Gegauf was willing to help Singer, it was only willing to do so if the assistance involved no risk to itself.

Following on the heels of the Phoenix letter claiming a license under the patent, Gegauf's statement confirming the existence of some sort of license came as an unpleasant surprise to Singer. Although, like Gegauf, Singer did not interpret the license to Phoenix as extending outside of West Germany, Singer was annoyed that Gegauf had not, as required by paragraph 6 of their assignment agreement disclosed its existence to Singer—particularly in view of the fact that this provision had been inserted in the agreement at Gegauf's suggestion. Here, certainly, was further evidence of the arm's length dealing which had characterized all Singer's dealings with Gegauf.

Much as Singer disliked Gegauf's attitude, it needed Gegauf's assistance in the Tariff Commission proceedings and in order to get it, Singer had to submit to the condition imposed. Thereupon, on July 14, 1959, Singer executed an indemnity agreement in protecting Gegauf against damage it might sustain from any claim of Phoenix. The revised agreement was signed by Gegauf on July 22, 1959. On the same day, Gegauf executed an affidavit stating that the reason it had requested a provision in the 1957 assignment that Singer not assert its patent against Pfaff without Gegauf's consent was the existence of a personal friendship with Pfaff's directors, and that it had not before nor since licensed or extended any rights to Pfaff under either Gegauf patent.

We are not at all concerned here with Gegauf's purpose or intent. It was Singer who was a plaintiff before the Commission. While Singer was technically correct in saying that Pfaff was not licensed by it under Gegauf, and while it appears that Gegauf never did extend any right to Pfaff under Gegauf I, the effect of the 1957 agreement was to permit Gegauf to give Pfaff a sublicense should it choose to do so.

The fact that no license was ever given to Pfaff bears on the truth of Singer's statement to the Commission that Pfaff had no license under Gegauf I—the only patent with which the Commission was concerned.

We find that the Tariff Commission proceedings were brought by Singer in a bona fide attempt to obtain protection for its "401" machine by an order excluding *all* unlicensed machines which infringed on Gegauf I patent. That these proceedings were motivated by the deluge of infringing Japanese imports and that Singer's energies were primarily directed to excluding these imports is not evidence of any unlawful conspiracy to exclude the Japanese and open the way for the European imports. The principal threat to the Singer machine came from the Japanese imports not from European production,

but Singer sought to bar all infringing machines. Nor do we find any evidence whatsoever in this tariff proceeding of an intent or attempt to monopolize the United States household automatic zigzag sewing machine industry. As a patent owner whose patent was being infringed by imports, Singer had every right to resort to the Commission.

There were four law suits filed by Singer following the acquisition of the Gegauf patents. Two of these suits were filed by Singer against Brother, the importer and distributor of sewing machines manufactured in Japan whom we have mentioned before, for alleged infringement of the Gegauf, Harris reissue and Johnson patents based on the sale of Japanese Nippon machine carried multicam zigzag machines (Selec-o-matic 100 and Pacesetter 200). The defendant Brother has pleaded nonvalidity, and the actions are presently pending. A suit has also been filed against Sewing Machine Exchange, alleging infringement of Gegauf and Harris patents based on the sale of Japanese Sanshin machine carried multicam zigzag machines (Universal). The fourth suit was filed against ACO alleging infringement of Gegauf, Harris and Johnson patents based on the sale of a Japanese Sanshin machine carried multicam zigzag machine (Fleetwood). The latter two suits terminated in a consent judgment enjoining defendants from selling any machine embodying the inventions in said patents.

It does not appear that Singer has filed any infringement suits on any patent which did not cover an article being manufactured or sold by it. The fact that it has instituted action on the Gegauf patent, thus placing squarely in issue its validity, as well as the validity of its other patents, belies any intent on its part to acquire broad patent protection regardless of validity.

## G. Alleged per se illegality of the Singer-Gegauf agreements.

It is the Government's contention that aside from the unlawfulness of

the Singer-Gegauf agreements as part of the alleged conspiracy, the license agreement is *per se* illegal under Sections 1 and 2 of the Sherman Act, by reason of the provision under which each party agreed not to do anything directly or indirectly to restrict the other's claims in the respective patent applications, and the assignment agreement by reason of the provision restricting Singer's right to assert the Gegauf patent against Vigorelli and Pfaff without Gegauf's consent.

We have already discussed the first of the provisions and have found nothing unlawful in it. No authority has been cited by the Government to support its contention of *per se* illegality. In spite of the sinister inference which the Government attempts to draw from this first provision, it does not contend that either Singer or Gegauf was under any "affirmative duty or obligation to seek to narrow or hold unpatentable claims which are in interference", but that conversely each was prohibited from agreeing with the other not to do that which it was under no legal duty to do.

We have found that there is nothing illegal in two parties agreeing not to oppose each other's claims, especially when these claims are not invalid and form the subject matter of an agreement between the parties. But even assuming, for the sake of discussion, that such provisions were illegal, no acts were done pursuant to this agreement and the claim of Gegauf I was concededly valid (Cf. United States v. National Lead Co., D.C., 63 F.Supp. 513, affd. 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077; United States v. Standard Oil Co., 7 Cir., 33 F.2d 617).

The Government concedes that it has found no authority in support of its charge of illegality and it would be astounding if it had.

Recognizing the weakness of the charge standing alone, the Government relates this provision to an alleged underlying agreement or alleged conspiracy to "pool patents" in Singer and to establish "broad patent monopolies" in both conspirators in order to exclude Japanese competition. The plain answer to this is that we have found that there was absolutely no agreement or conspiracy.

As for the second provision, the Government says it is a *per se* violation of the anti-trust laws in that it has been held that a patentee and his licensee may not jointly determine between themselves the parties to be licensed or sued. United States v. Besser, D.C., 96 F.Supp. 304, affd. 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063; United States v. Krasnov, D.C., 143 F.Supp. 184; Mason City Tent & Awning Co. v. Clapper, D.C., 144 F. Supp. 754. We believe that the contention of *per se* illegality was apparently abandoned during the trial; the Government however does attempt to relate it to the overall conspiracy.

The defendant's answer is that this provision is not an agreement calling for joint decision as to who should be licensed or sued but is, in effect, a grant to Gegauf of the right to sublicense Pfaff or Vigorelli—Gegauf granting the license by independently refusing to give assent to an infringement suit by Singer against the latter. The provision now has no special significance when weighed with all the evidence; it was expunged from the assignment, prior to the filing of the suit, at Singer's request. Of course, the mere fact of deletion, if the provision were in fact illegal, would not remove it from our consideration, for its existence might be some evidence tending to point to an illegal purpose or understanding to "pool" patents in the hands of Singer. Although it might be argued that the effect of the provision in question is as if Gegauf had been given the right to sublicense Pfaff or Vigorelli, that is not its language and the only question is whether the restriction could constitute a *per se* violation of the Sherman Act.[1]

1. It should be noted that it was of no practical significance with respect to Vig- orelli since Singer by the cross-license agreement of November 17, 1955 had al-

■ An examination of the patent anti-trust cases, dealing with restrictions other than price fixing, shows that rarely is a single restriction involved. Thus, while the Court has clearly condemned a restriction requiring the consent of the non-exclusive licensee before the patentee may grant a license to another (United States v. Besser Mfg. Co., supra), a restriction, as here, requiring joint approval of the patentee and the non-exclusive licensee before an infringement suit can be brought, has been condemned only as a part of a host of abuses, the total of which were found to be in violation of the Sherman Act. Mason City v. Clapper, supra; United States v. Krasnov, supra.

This is not a situation where restrictions were imposed upon a patent holder as to whom it might license. In the first place, Singer was free to license its patent to as many or as few as it chose, and Gegauf had nothing to say about it. In the second place, although the necessity to obtain the consent of Gegauf before Singer could sue Pfaff for infringement might at first appear to come within the prohibition of Mason City and Krasnov it is distinguishable on several grounds. This was the only restriction on Singer's ownership; it was limited to one specific company; it was a conditional and future restriction which might never come to pass and which in fact did not; and finally there was nothing to prevent or stop Singer from permitting any other number of importers to compete with Pfaff, either by the express grant of a license or by non-assertion of its patent.

Moreover, since Singer did not intend to license others under its patent, the exercise of the restriction would serve to promote rather than restrict competition in that Gegauf, by bringing its veto power to bear, could enable Pfaff and Vigorelli to continue to compete with Singer and with Gegauf itself. If, on the other hand it be viewed as an unlawful restraint in that such a provision gave Gegauf by agreement the power to prefer one competitor over another, by permitting Pfaff to import free of threat of infringement, the matter has become academic by reason of the fact that it has been deleted from the agreement.

Aside from this there was no other understanding or agreement with respect to licensing or enforcing by infringement action or otherwise, any patent, then owned or subsequently acquired, or with respect to the use in any way of any such patent, alone or in conjunction with any other patent. The written agreement expressed the complete agreement and understanding of the parties and we conclude that it contained nothing illegal.

H. The alleged attempt to monopolize.

With respect to the monopoly charge, the Government's theory is:

1) that there was a conspiracy to achieve for Singer a monopoly in the sale and distribution of automatic zigzag sewing machines by the exclusion from the United States of all such machines of Japanese origin;

2) that Singer by itself sought to achieve such a monopoly by excluding all such machines regardless of origin and by preventing their domestic manufacture, thereby entrenching itself as the sole source of supply;

3) that even if the alleged conspirators' conduct does not establish a conspiracy in restraint of trade under Section 1, it does establish a conspiracy to monopolize; and

4) that even if no conspiracy to either restrict or monopolize is found, Singer's acts establish an attempt on its part to monopolize.

The same conduct is relied upon to establish the conspiracy and attempt to monopolize as was relied upon to establish the conspiracy to restrain trade.

ready licensed Vigorelli to sell its multi-cam machine in the United States and, therefore, could not bring any infringement action against Vigorelli in any event.

Thus, properly interpreted, this provision restricted Singer's freedom to enforce the Gegauf patents only with respect to Pfaff.

Our finding that there was no conspiracy among Singer, Gegauf and Vigorelli to do anything disposes of the charge that there was a conspiracy to monopolize for Singer.

■ And now, we turn to consider the allegation that there was an attempt to monopolize. Under Section 2 an attempt to monopolize has been made a violation separate and distinct from a conspiracy to restrain trade or to monopolize. A finding, therefore, that certain conduct does not constitute a violation of Section 1 or a conspiracy to violate Sections 1 or 2, does not necessarily preclude a finding that the same conduct is an attempt to violate Section 2, provided it is accompanied by a specific subjective intent to achieve a monopoly. United States v. Columbia Steel Co., 334 U.S. 495, 531, 68 S.Ct. 1107, 92 L.Ed. 1533; Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518.

Our conclusion, therefore, that in acquiring the Gegauf and Messerschmitt applications Singer was motivated by entirely lawful and "sound business reasons" is not dispositive of the charge that in doing so it was engaged in an attempt to monopolize the household automatic zigzag sewing machine industry in the United States. United States v. Columbia Steel Co., supra, 334 U.S. at p. 518, 68 S.Ct. 1107.

It is the Government's contention that the purpose of Singer in acquiring the Gegauf and Messerschmitt patent applications was to be in a position to prevent the importation and sale of Japanese made machines which, because of their lower price were in substantial competition with Singer and prevent the manufacture of these machines in the United States.

The Government argues that this purpose was clearly manifested by (1) the refusal of Singer to license under its patents; (2) the filing of infringement suits and Tariff Commission proceedings against competitors; and (3) Singer's own words that it wanted to get the very best patents "to bar imports or United States production of mechanisms which would violate these patents" and that the acquisition of Messerschmitt's foreign application would be "very much worthwhile * * * if of any value to restrict Japanese especially Brother."

Certainly, the very limited acquisition of Singer (two patent applications) cannot even be discussed in the same context with the acquisitions condemned in United States v. United Shoe, D.C., 110 F. Supp. 295, affd. p.c. 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910, which the Government cites in support of its charge. The fact that Singer was most reluctant to license under its patents and did so to Pfaff only under protest, does not add a whit to establishing an unlawful intent. The same observation may be made of the fact that Singer did license Sears Roebuck under its Gegauf patent thereby permitting the importation into the United States of 20,000 zigzag sewing machines. This, as well as the filing of infringement suits and the Tariff Commission proceedings, was its prerogative as a patent owner. We have been cited to no case which imposes a duty on the owner of a patent to license others or suffer infringement of its patent in order to escape a charge of intent to monopolize. The exclusion of competition through patent ownership is the lawful result of the monopoly which the law grants to a patent owner.

■ Singer's refusal to grant licenses to competitors and its attempt to eliminate infringers, leaving as competitors all manner of sewing machines with devices capable of doing the same thing over which Singer had no control, indicates no intent nor attempt to achieve an illegal monopoly. United States v. General Electric, D.C., 80 F.Supp. 989; Cole v. Hughes Tool Co., 10 Cir., 215 F.2d 924, cert. den. 348 U.S. 927, 75 S.Ct. 339, 99 L.Ed. 726; Dollac Corp. v. Margon Corp., D.C., 164 F.Supp. 41. These were acts which were perfectly consistent with a lawful intent and purpose to protect its patents and machines.

**432**

It is, therefore, unnecessary to consider at length Singer's power to achieve a monopoly in the relevant market as bearing on its intent. If it were necessary to our decision, we would find the relevant market to be automatic zigzag sewing machines of four types: machine carried multicam zigzag, replaceable cam, manually operated and the straight stitch sewing machine with zigzag attachment. These four machines, we find, are sufficiently unique to constitute a separate market within which these machines are reasonably interchangeable for the use to which they are put. United States v. E. I. Du Pont, 351 U.S. 377, 395, 396, 76 S.Ct. 994, 100 L.Ed. 1264. Within the market as defined the evidence clearly establishes that Singer did not have the power to achieve a monopoly; this lack of power further evidences absence of a specific intent on Singer's part to achieve a monopoly. U. S. v. Columbia Steel, supra.

The Government has failed on all the evidence to support its charge that Singer attempted to monopolize as it has failed to support any and all of the unlawful acts charged against Singer in the complaint. United States v. Yellow Cab, 332 U.S. 218, 225, 67 S.Ct. 1560, 91 L.Ed. 2010.

### III. CONCLUSIONS OF LAW.

We conclude therefore that:

1. This Court has jurisdiction over the defendant and the subject matter of this suit.

2. Defendant did not conspire with the alleged coconspirators to unreasonably restrain interstate and foreign commerce in violation of Section I. of the Act.

3. Defendant did not conspire with the alleged coconspirators to monopolize nor attempt by itself to monopolize interstate and foreign commerce in violation of Section 2 of the Act.

The Clerk is directed to enter judgment dismissing the complaint herein on the merits.